IN THE COURT OF APPEALS OF TENNESSEE

AT NASHVILLE

**FILED**

**September 3, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| WILLAMETTE INDUSTRIES, INC., | ) | C/A NO. 01A01-9812-CH-00639 |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | APPEAL AS OF RIGHT FROM THE |
| | ) | DAVIDSON COUNTY CHANCERY COURT |
| | ) | |
| | ) | |
| TENNESSEE ASSESSMENT APPEALS | ) | |
| COMMISSION, WAYNE COUNTY | ) | |
| ASSESSOR OF PROPERTY, and | ) | |
| WAYNE COUNTY TRUSTEE, | ) | |
| | ) | HONORABLE CAROL L. McCOY, |
| Respondents-Appellees. | ) | CHANCELLOR |


For Appellant

JERRY C. SHELTON
Lyell, Seaman & Shelton
Nashville, Tennessee

For Appellee Tennessee
Assessment Appeals Commission

PAUL G. SUMMERS
Attorney General & Reporter
Nashville, Tennessee

SEAN D. CLANCY
Assistant Attorney General
Nashville, Tennessee


For Appellees Wayne County
Assessor of Property and
Wayne County Trustee

JAMES Y. ROSS, SR.
Waynesboro, Tennessee


O P I N I O N


AFFIRMED AND REMANDED                                    Susano, J.

The petition in this case seeks judicial review of real property valuations established by a final order of the Tennessee Assessment Appeals Commission ("AAC"), a body created by the State Board of Equalization to hear "appeals regarding the assessment, classification and value of property for purposes of taxation." T.C.A.§ 67-5-1502(a). The AAC's order in the instant case fixed, for *ad valorem* tax purposes, the separate values of 15 parcels of Wayne County woodland owned by the petitioner, Willamette Industries, Inc. ("Willamette"). Upon review of the AAC's order, the trial court held, among other things, that the appraisal methodology utilized by the AAC was not *per se* contrary to Tennessee law, and that the record contained substantial and material evidence to support the AAC's valuations based upon that methodology. Accordingly, it affirmed the AAC's order. Willamette appeals, raising the following issues for our consideration:

1. Do Tennessee statutes and case law, prior decisions of the AAC, and the administrative procedures manual for Wayne County require woodland with growing trees to be valued by the "residual method," whereby the value of standing timber is subtracted from the sale price of comparable land with standing timber to arrive at the "residual value" for the land only?

2. Is there substantial and material evidence to support the value set by the AAC for Willamette's woodland?

3. Did the appraisal methodology used by the Wayne County Assessor and State Division of Property Assessments for Willamette's woodland, but not for any other woodland appraisals in Wayne County, deny Willamette equal protection under the United States and Tennessee Constitutions?

2

I.  *Facts and Procedural History*

In 1992, the respondent, the Wayne County Assessor of Property ("the County"),[1] assisted by the State Department of Property Assessments ("DPA"), completed a reappraisal of all taxable real property in Wayne County.  Information regarding 70 property sales was compiled by Leon Oliver, a DPA employee, who analyzed each sale and subtracted from the sales price an estimated value for any appropriate deductions, including standing timber.  This information was compiled into a "Rural Land Schedule[2]," which in turn formed the basis for the appraisal of, among other things, all woodland in Wayne County, including the 15 parcels owned by Willamette.[3]

Application of the Rural Land Schedule resulted in a weighted average value[4] of $178 per acre for Willamette's 10,061 acres.  The $178 per acre value was arrived at by substracting from the gross value per acre the sum of $62 per acre representing the alleged value of the standing timber.[5]  Arguing that this adjustment for the excepted-from-taxation timber was

---

[1]The Wayne County Trustee, as well as the AAC, were also named as respondents in the Chancery Court proceeding.  For ease of reference, the Wayne County Assessor of Property and the Wayne County Trustee will collectively be referred to as "the County" in this opinion.

[2]The Rural Land Schedule consists of a grid of per-acre values, with four land types broken down into four location factors and three quality factors--good, average, and poor.

[3]Willamette's properties in Wayne County range in size from 43 to 2,973 acres, and aggregately comprise some 10,061 acres.

[4]The weighted average value per acre was determined by multiplying the number of acres in each tract by the per acre value assigned to that tract, adding the products of those multiplications, and dividing the total by the 10,061 acres.

[5]Timber is included in the statutory list of "growing crops" that have been specifically excepted from taxation in Tennessee.  *See* T.C.A. § 67-5-216(a).

inadequate, Willamette appealed the County's assessments to the Wayne County Board of Equalization. After receiving an unfavorable determination there, Willamette then appealed to the State Board of Equalization. A hearing before an administrative law judge was held on January 4 and 5, 1994. The administrative law judge determined that the timber values had been underestimated and ordered that the appraisal of Willamette's properties be reduced by an additional $67 per acre, *i.e.*, that the average adjustment for timber be increased from $62 per acre to $129 per acre -- the amount calculated by Willamette based upon research by its own experts, as well as U.S. Forest Service statistics. In so holding, the administrative law judge adopted the "residual method" of woodland valuation advocated by Willamette. Under that method, the value of each parcel was reduced by the estimated value of its standing timber to determine the land's "residual" value for tax assessment purposes.

Being dissatisfied with the judgment of the administrative law judge, the County appealed to the AAC. A hearing was held before that body on February 25 and 27, 1997. At the hearing, the County presented testimony from three witnesses, including Charles Smith ("Smith"), a DPA employee and certified general appraiser who was qualified as an expert with regard to the valuation of rural land. Smith calculated the weighted average value of Willamette's properties -- without the standing timber -- at $168 per acre. In reaching this conclusion, he utilized a "direct comparable sales" comparison method, whereby he determined the value of the subject properties

5

by comparing them to sales of land from which the timber had either been removed or sold independent of the land.  In the course of his analysis, Smith visited all of Willamette's properties and compared them to 28 similar properties selected from the 70 sales that had formed the basis of the Rural Land Schedule.

In addition to the direct comparable sales method advocated by Smith and the County, the AAC heard testimony regarding the residual method, described above, and the "land expectation" method, under which an expected income from timber is projected for the land and capitalized at an appropriate rate. Extensive proof regarding the latter two methods was offered by Willamette through the testimony of its expert witnesses. Willamette contended that the values for its properties should be reduced by an average adjustment of $136 per acre, representing the alleged value of the timber on the respective parcels.  The AAC, however, found as follows:

> ...the direct [comparable sales] method is an attractive alternative if sufficient qualified sales are available, and that is the case here.  The Division of Property Assessments reexamined its collection of sales in the course of defending taxpayer's appeal, and while this data is not uniformly beyond reproach, it offers a credible alternative to the difficult adjustments required by the residual method.

The AAC referred to two particular sales cited by the County and DPA, noting that use of such sales to determine the value of the subject parcels "offer[ed] a more credible alternative to the residual method as applied by [Willamette's] experts in this

case." Therefore, the AAC modified the decision of the administrative law judge and determined that Willamette's properties should be assessed at a weighted average of $160 per acre.[6] It assigned total values to each of the 15 parcels in an exhibit attached to its final decision and order, which was entered on March 18, 1997.

Willamette subsequently petitioned the trial court for review of the AAC's decision. After hearing argument based upon the proof in the administrative record, the trial court affirmed the findings of the AAC. The trial court held as follows:

> [Willamette] contends that as a matter of law, the residual method is the only method that should be utilized in valuing woodland. The Court does not reach that conclusion. The case of *Richardson v. Tennessee Assessment Appeals Commission*, 828 S.W.2d 403 (Tenn.App. 1991) does not declare an exclusive method of valuation. This Court cannot find Tennessee case law or [any] statute that designates a sole methodology for valuing woodland. In light of this, the Court cannot conclude, as a matter of law, that the residual method is the only method to be utilized in valuing woodland. Indeed, the legislature established specific administrative agencies to determine property values which have acquired extensive knowledge and expertise. The process of valuing property is intensely factual, and flexibility is necessary for the expert agencies to value property in wide ranging circumstances. "Courts will defer to the decisions of administrative agencies when they are acting within their area of specialized knowledge, experience, and expertise." *Wayne County [v. Tennessee Solid Waste Disposal Control Board*, 756 S.W.2d 274, 279 (Tenn.App. 1988)].

---

[6]The AAC did note that the DPA had erroneously treated certain of Willamette's parcels as small tracts because they comprised portions of larger tracts that extended into other counties. It therefore recalculated the values assigned by the DPA to reflect the true size of the respective parcels.

> The record reveals that the AAC examined
> sales compiled by Charles Smith and found
> there were sufficient qualified sales to use
> the direct comparable [sales] method in
> valuing [Willamette's] woodland.  The AAC
> identified two sales out of Mr. Smith's
> report to support its decision to use the
> direct comparable sales method.  Both of
> those sales involved the sale of land only,
> with timber not being a factor in the sale.
> These land only sales support the AAC's
> valuation of [Willamette's] properties.
> [Willamette] contends the AAC merely adopted
> Mr. Smith's conclusions; however, that is not
> evident from the record.  The AAC, after
> hearing all the testimony and reviewing the
> exhibits, found the direct comparable [sales]
> method offered a credible basis to determine
> the land values compared to the questionable
> values resulting from use of the residual
> method.  The Court concludes there is
> substantial and material evidence in the
> record to support the AAC's decision.

The trial court also held that the AAC had not erred in allowing Smith to testify regarding his report and opinions despite the fact that the witness had relied upon hearsay information obtained from buyers and sellers of the subject properties.  Furthermore, the Court held that the AAC's valuation of Willamette's property had not resulted in any denial of equal protection to Willamette.  Accordingly, the trial court affirmed the decision of the AAC in its entirety, and this appeal followed.

## II. *Applicable Law*

Generally speaking, courts will "defer to decisions of administrative agencies when they are acting within their area of specialized knowledge, experience, and expertise." **Wayne County v. Tennessee Solid Waste Disposal Control Board**, 756 S.W.2d 274,

279 (Tenn.App. 1988).  Thus, judicial review of such

determinations is governed by "the narrow, statutorily defined

standard contained in [T.C.A.] § 4-5-322(h) rather than the broad

standard of review used in other civil appeals." *Wayne County*,

756 S.W.2d at 279.  Specifically, T.C.A. § 4-5-322(h)(5)[7]

provides, as relevant here, that the reviewing court

> may reverse or modify the decision if the
> rights of the petitioner have been prejudiced
> because the administrative findings,
> inferences, conclusions or decisions are:
>
>      *     *     *
>
> (5) Unsupported by evidence which is both
> substantial and material in the light of the
> entire record.
>
> In determining the substantiality of
> evidence, the court shall take into account
> whatever in the record fairly detracts from
> its weight, but the court shall not
> substitute its judgment for that of the
> agency as to the weight of the evidence on
> questions of fact.

Thus, we will not substitute our judgment regarding the weight of

the evidence for that of the agency, even where the evidence

could support a different result.  *Wayne County*, 756 S.W.2d at

279 (citing *Humana of Tennessee v. Tennessee Health Facilities

Comm'n*, 551 S.W.2d 664, 667 (Tenn. 1977)); *Grubb v. Tennessee

Civil Serv. Comm'n*, 731 S.W.2d 919, 922 (Tenn.App. 1987); *Hughes

v. Board of Commissioners*, 319 S.W.2d 481, 484 (Tenn. 1958)).

Stated another way,

---

[7]T.C.A. § 4-5-322 is contained in the Uniform Administrative Procedures
Act, codified at T.C.A. § 4-5-101, *et seq.*

> [a]n agency's factual determination should be upheld if there exists "such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration."

*Wayne County*, 756 S.W.2d at 279 (quoting *Southern Ry. v. State Bd. of Equalization*, 682 S.W.2d 196, 199 (Tenn. 1984); *Sweet v. State Technical Inst.*, 617 S.W.2d 158, 161 (Tenn.App. 1981)). As further explained in *Wayne County*,

> [t]he general rules governing judicial review of an agency's factual decisions apply with even greater force when the issues require scientific or technical proof. Appellate courts have neither the expertise nor the resources to evaluate complex scientific issues de novo. When very technical areas of expertise are involved, they generally defer to agency decisions, and will not substitute their judgment for that of the agency on highly technical matters.
>
> However, the court's deference to an agency's expertise is no excuse for judicial inertia. Even in cases involving scientific or technical evidence, the "substantial and material evidence standard" in [T.C.A.] § 4-5-322(h)(5) requires a searching and careful inquiry that subjects the agency's decision to close scrutiny.

*Wayne County*, 756 S.W.2d at 280 (citations omitted).

With regard to the valuation of real property for tax purposes, T.C.A. § 67-5-601(a) mandates that

> [t]he value of all property shall be ascertained from the evidence of its sound, intrinsic and immediate value, for purposes of sale between a willing seller and a

10

willing buyer without consideration of
speculative values....

The Tennessee Constitution provides that "all property real,
personal or mixed shall be subject to taxation... except the
direct product of the soil in the hands of the producer, and his
immediate vendee...." TENN.CONST. art. II, § 28. Growing crops
-- including timber -- are specifically exempted from property
taxation by T.C.A. § 67-5-216(a).

III. *The Parties' Contentions*

On appeal, Willamette argues that the appropriate
method of valuing woodland is by means of the residual method,
*i.e.*, analyzing sales of comparable property with growing trees
and deducting the value of the timber to arrive at a residual
value for the land itself. Willamette insists that use of the
residual method is mandated by Tennessee statutes, case law,
prior decisions of the AAC, and the appraisal manual used by the
County and the DPA. Willamette chiefly relies upon the decision
of this court in **Richardson v. Tennessee Assessment Appeals
Comm'n**, 828 S.W.2d 403 (Tenn.App. 1991), in which we affirmed the
lower court's use of the residual method of valuing property with
surface and mineral values. In its brief, Willamette argues that
**Richardson** "unequivocally" sets forth "the appraisal methodology
required by law for valuation of land exclusive of timber and
mineral values."

11

Willamette also contends that the record does not contain substantial and material evidence to support the AAC's decision that the direct comparable sales method was appropriate for valuation of the subject woodland. In this connection, Willamette argues that the only credible proof regarding the growing timber's value came from its own witnesses, and that the testimony of the County's witnesses was unreliable, erroneous, and based upon inadmissible hearsay. Willamette also contends that the AAC improperly relied upon two sales of cut-over property selected by Smith, and that the AAC was simply attempting to affirm whatever values the assessing officials had previously determined.

Finally, Willamette argues that it has been denied equal protection under the United States and Tennessee Constitutions, by virtue of the administrative agencies' application of the direct comparable sales method to its properties, but allegedly to no others in Wayne County. Willamette contends that the County and DPA, in an effort "to approximate the erroneous Rural Land Schedule values," "devised this 'cut-over' or 'direct sales comparison' valuation theory to apply only to Willamette's property."

The County, on the other hand, contends that *Richardson* is inapplicable to the instant case; that neither *Richardson*, nor any other authority, mandates the exclusive use of a *single* appraisal method; that the record supports the AAC's determination that, under the circumstances of this case, the direct comparable sales method was preferable to the residual

12

method; and that Willamette did not prove that application of the direct comparable sales method had resulted in any denial of its right to equal protection.

The AAC likewise argues in its brief that the appraisal methodology applied to Willamette's woodland did not deny Willamette equal protection under either the state or federal constitution. The AAC also argues that "[t]here is no legal requirement that only the residual assessment method be used to determine the value of timberland," and that, as a matter of public policy, the assessing agencies "should be permitted to use the assessment methodology for ad valorem tax purposes that produces the fairest and best valuation of a given piece of property."

IV. *Analysis*

*A.*

Turning first to Willamette's issue regarding the proper method of valuation, we do not find that the applicable statutory scheme, Tennessee case law, or the appraisal manual used by the County and DPA[8] *require* that the residual method be utilized in the valuation of timberland. On the contrary, no authority suggests that any single method is mandated, to the exclusion of all others. Although we affirmed the lower court's

---

[8]The DPA's "Rural Land Procedures Manual "provides that "[t]imber is considered as a growing crop and is always treated as a negative adjustment," and that its "value must be removed from the selling price to arrive at a value indication for land only." These provisions are consistent with T.C.A. § 67-5-216(a), which exempts timber from taxation. They do not mean -- as Willamette argues -- that the residual method is the only permissible methodology to achieve this objective.

13

use of the residual method in the **Richardson** case, we did not hold that it was the *exclusive* method available to the assessing agencies; on the contrary, that case simply holds that, under the facts prsented there, use of the residual method was appropriate. *See* **Richardson**, 828 S.W.2d at 407-08. By the same token, we are not aware of, nor have we been cited to, any other authority mandating use of a single appraisal methodology.

We therefore must consider the question of whether the record contains substantial and material evidence to support the AAC's decision to accept appraised values that were determined by means of the direct comparable sales method. The record contains extensive testimony regarding several different methods of valuation, each of which possesses inherent advantages and disadvantages. The County's witnesses opined that the direct comparable sales method was preferable in the instant case. Smith testified that he would only use the residual method where an insufficient number of sales of vacant land were available for comparison. Another of the County's witnesses, Bob Rusk, testified that the direct comparable sales method was useful where, as here, sufficient information regarding other sales is available; he also stated that the residual method was not as suitable for use in Wayne County as it would be in a more stable market where timber and land prices had not changed much over a long period of time. Rusk further testified regarding the various advantages and disadvantages of the two methods. Willamette, on the other hand, presented extensive testimony regarding the residual method. One of Willamette's witnesses, Dr. Robert Parker, disputed the timber values calculated by Smith

14

and Rusk, and maintained that the residual method was the best way to arrive at an accurate valuation of the taxable raw land. Willamette also offered other testimony based upon the residual method, including that of Robert Williams, who supported Willamette's contention that the appropriate average timber deduction should be approximately $136 per acre.

It is clear that the AAC was confronted with a conflict in the expert testimony. As explained in *Wayne County*,

> [a]gencies are not bound by the expert opinions presented to them. Because of their presumed expertise and knowledge, agencies are accorded "wide discretion in determining the weight or probative value to be given the testimony of the expert witness...."
>
> Resolving conflicting evidence is for the agency. Thus, when conflicts in expert testimony arise, it is the agency's prerogative to resolve them, not the court's.

*Id.* at 281 (citations omitted).

As previously explained, courts typically will defer to an agency decision where the agency is acting within its area of knowledge and expertise, *Id.* at 280, and this is particularly true where technical or scientific matters are involved. *Id.* Admittedly, the record contains evidence regarding both advantages and disadvantages of each appraisal method, as well as evidence that the residual method could, in certain instances, be the preferable means of valuation. On the other hand, it also contains credible evidence indicating that, under the

15

circumstances of this case, the direct comparable sales method represented the appropriate choice.

The evidence establishes that the use of the direct comparable sales method in this case satisfies the requirements of T.C.A. § 67-5-601(a). Having decided that the valuation *methodolgy* utilized by the AAC was, in general terms, in compliance with the statutory mandate, we now must decide if the record reflects "such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the" valuations determined by the AAC." ***Wayne County,*** 756 S.W.2d at 279.

*B.*

Willamette contends that the record does not contain substantial and material evidence to support the appraisal *values* calculated by the AAC. In reaching its conclusion, the AAC essentially accepted the values suggested by Smith and Rusk, and rejected those advanced by Willamette's witnesses. Again, these determinations required the AAC to resolve conflicting expert testimony regarding valuations of the subject properties. Under these circumstances, we cannot substitute our judgment for that of the AAC, as affirmed by the trial court. We find that the record does contain substantial and material evidence to support the appraisal values assigned to Willamette's properties by the AAC in the exhibit to its final order. ***Id.*** at 279.

*C.*

16

Willamette also argues that the testimony of the County's witnesses was based on inadmissible hearsay -- in particular, statements from various buyers and sellers of property in Wayne County -- and did not "possess sufficient indicia of credibility" to be admissible under Rule 703, Tenn.R.Evid. Rule 703 provides, in pertinent part, as follows:

> If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data [relied upon by the expert] need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Rule 703, Tenn.R.Evid.

The record indicates that obtaining information from buyers and sellers of property is a common practice utilized by real estate experts in forming opinions such as those at issue in the instant case. Therefore, in accordance with the above-quoted language from Rule 703, the County's witnesses were entitled to rely upon the facts and data in question. Furthermore, although the record certainly contains some testimony contrary to that offered by the County's witnesses, it does not reflect such a lack of trustworthiness as to render the testimony of the County's witnesses inadmissible. Willamette's argument on this point is found to be without merit.

*D.*

We next turn to Willamette's equal protection argument. In this context, Willamette relies in part upon the decision of the United States Supreme Court in ***Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster County, West Virginia***, 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989). In that case, the Supreme Court held that certain property valuations by the county tax assessor had resulted in "gross disparities in the assessed value of generally comparable property[9]," and had therefore denied the taxpayers equal protection under the Fourteenth Amendment. ***Id.***, 109 S.Ct. at 635. In so holding, the Court stated as follows:

> That two methods are used to assess property in the same class is, without more, of no constitutional moment. The Equal Protection Clause "applies only to taxation which in fact bears unequally on persons or property of the same class...." In each case, the constitutional requirement is the seasonable attainment of a rough equality in tax treatment of similarly situated property owners.

***Id.***, 109 S.Ct. at 637-38 (citations omitted). The Court also noted that

> [t]he States, of course, have broad powers to impose and collect taxes. A State may divide different kinds of property into classes and assign to each class a different tax burden so long as those divisions and burdens are reasonable.... In each case, "[i]f the selection or classification is neither capricious nor arbitrary, and rests upon some

---

[9]The "gross disparity" in ***Allegheny*** resulted from the Webster County Tax Assessor's valuation of the petitioners' property on the basis of its recent purchase price, as compared to her valuation of similar properties that had not recently been sold by making only minor adjustments to their most recent, but much older, sale price.

18

> reasonable consideration of difference or
> policy, there is no denial of the equal
> protection of the law."

*Id.*, 109 S.Ct. at 638 (citations omitted).

In the *Allegheny* case, the Court found that the property of the petitioners had been assessed at approximately "8 to 35 times more than comparable neighboring property, and [that] these discrepancies have continued for more than 10 years with little change." *Id.*, 109 S.Ct. at 638. Noting that the petitioners had "suffered from such 'intentional systematic undervaluation by state officials' of comparable property" in the County, the Court held that "[t]he relative undervaluation of comparable property in Webster County over time therefore denies petitioners the equal protection of the law." *Id.*, 109 S.Ct. at 639.

Upon review of the record in the instant case, we cannot say that Willamette has suffered a denial of equal protection by virtue of "gross disparities in the assessed value of generally comparable property" such as occurred in *Allegheny*. *See Id.*, 109 S.Ct. at 635. Although there is proof in the record showing that different appraised values for Willamette's properties resulted depending upon which valuation method was employed, such differences generally were not of the magnitude of those in *Allegheny.* As explained in that case, the mere fact that the assessing agencies have employed different appraisal methods "is, without more, of no constitutional moment." *Id.*, 109 S.Ct. at 637. The record here simply does not contain proof

19

that the AAC's use of the direct comparable sales method resulted in an absence of "rough equality in tax treatment of similarly situated property owners." *Id.*, 109 S.Ct. at 638. We therefore hold that the Chancery Court correctly held that Willamette had not been denied equal protection under the Fourteenth Amendment.

Also with regard to its equal protection argument, Willamette relies upon Article II, § 28 of the Tennessee Constitution, which section provides, in pertinent part, as follows:

> The ratio of assessment to value of property in each class or subclass shall be equal and uniform throughout the State, the value and definition of property in each class or subclass to be ascertained in such manner as the Legislature shall direct. Each respective taxing authority shall apply the same tax rate to all property within its jurisdiction.

There is no proof in the record before us establishing that the "ratio of assessment to value" of Willamette's property was not equal or uniform to other properties in the same class throughout the state. Furthermore, as explained earlier, the appraisal and assessment of Willamette's properties was in compliance with the requirement of T.C.A. § 67-5-601(a) that "[t]he value of all property shall be ascertained from the evidence of its sound, intrinsic and immediate value, for purposes of sale between a willing seller and a willing buyer without consideration of speculative values."

20

Willamette's equal protection issue is found to be without merit.

## V. *Conclusion*

The judgment of the Chancery Court is affirmed. Costs on appeal are taxed to the appellant. This case is remanded to the trial court for the collection of costs assessed there, pursuant to applicable law.

_____
Charles D. Susano, Jr., J.

CONCUR:

_____
Houston M. Goddard, P.J.

_____
Herschel P. Franks, J.

21