IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 18, 2010 Session

## JAMES Q. HOLDER, et al., v. WESTGATE RESORTS LTD., a Florida Limited Partnership d/b/a WESTGATE SMOKY MOUNTAIN RESORT AT GATLINBURG

Appeal from the Circuit Court for Sevier County
No. 2004-0477-II      Hon. Richard R. Vance, Judge

No. E2009-01312-COA-R3-CV - FILED JULY 23, 2010

Plaintiff sustained personal injuries resulting from a fall on defendant's premises and brought this action for damages, which resulted in a jury verdict in favor of plaintiff for damages against defendant.  Defendant appealed, and asserted that the Trial Judge erred when he refused to allow defendant's expert to testify to his conversation with a third party.  On appeal, we hold that the Trial Court erred in refusing to allow the proffered testimony, but the error was harmless.  We affirm the Judgment of the Trial Court.

**Tenn.  R. App. P.3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, J., joined, and CHARLES D. SUSANO, JR., J., filed a separate opinion, concurring in part and dissenting in part.

John M. Lawhorn, Knoxville, Tennessee, for the appellant, Westgate Resorts, Ltd.

James H. Ripley, Sevierville, Tennessee, for the appellees, James Q. Holder and wife, Laura C. Holder.

### OPINION

Defendant has appealed the Trial Court's judgment in favor of plaintiff in a personal

injury action wherein a jury returned a verdict for plaintiff for damages resulting from a fall. The issue on appeal alleges that the Trial Court committed reversible error when it sustained plaintiffs' hearsay objection to certain testimony of defendant's expert witness.

Plaintiff in his Complaint, alleged that he sustained bodily injuries when he fell down a common area stairway on the property owned by defendant. Plaintiff alleged that his injuries were the direct, proximate and legal result of the negligence of defendant by: (1) locating a stairway adjacent to an exit from a residential area in such a way that the stairway constituted a trap and an unreasonably dangerous condition; (2) locating a stairway landing of inadequate size immediately adjacent to a an exit door of a residential unit and; (3) failing to place proper warnings at or near the stairway.

Defendant answered, generally denying plaintiffs' claims and alleged the affirmative defense of the negligence of plaintiff. Following trial, the jury returned a verdict in favor of plaintiffs, assessing 90% fault against defendant and 10% fault against plaintiffs, and assessed total damages in the amount of $220,000.00, which included $2,520.06 awarded to plaintiff's wife for loss of consortium.

During the trial, the parties stipulated that the 1997 Southern Standard Building Code (building code) was the building code that was applicable to this case. Plaintiff presented expert testimony from architect Keith Moody regarding the alleged dangerous condition of unit 110B's kitchen exit. Defendant presented testimony from Jay Horner, a deputy building inspector for the City of Gatlinburg regarding whether the exit was compliant with the applicable building code. Both experts agreed that § 1012.1.5 of the building code was the pivotal section for the determination of whether the exit was code compliant. That section provides:

> Doors opening onto exit stairs or other approved exits shall not obstruct the travel along any required exit. Doors opening onto exit access corridors or onto a landing shall not reduce the corridor width or the landing width to less than one-half the required width during the opening process. When fully open, the door shall not project more than 7 inches (178 mm) into the required width of a corridor or a landing.

Initially, the two experts disagreed about what the exit area at issue should be called. Mr. Horner argued that the area was a "landing" or an "exit access" and that Mr. Moody's designation of the area as an"exit access corridor" was wrong. The importance of the name applied to the subject area was initially thought to be pertinent to the codal requirement for the minimum width for the area. Mr. Horner maintained that the minimum required width of the "landing" of "exit access" was 36 inches under Table 1004 of the code, while Mr.

Moody initially stated that the minimum requirement for an "exit access corridor" was 44 inches. The disagreement between the experts was resolved when Mr. Moody, on rebuttal, conceded that the code only required a minimum width of 36 inches. Further, Mr. Horner acknowledged that "in his view of the code there is no difference between an 'exit access' and an 'exit access corridor'" and that both had a minimum required width of 36 inches. Both experts agreed that the actual width of the corridor/landing was 36 inches, thus one half of the width would be 18 inches.

Mr. Moody stated that under § 1012.1.5 the exterior door, which opened onto exit area, could not reduce the corridor or landing width to less than 18 inches at any point during the opening process. He then demonstrated through diagrams and photographs that the exit area at issue had not met this code requirement. First he showed that when the exterior door is opened 10% of the way into the exit area, the width of the accessible area was reduced to just 3 ½ inches, a clear violation of § 1012.1.5 of the code. He also demonstrated that not until the door is opened 75% of the way into the exit area was required 18 inches of cleared area met. However, he showed through a photograph that the fact that the code was complied with when the door is 75% of the way open did not mean the area was safe. The photograph showed Mr. Moody opening the exterior door 75% . At that point, his back was up against the closed interior door and the exterior door, which was in the process of opening, was pressed up against his chest, prohibiting him from opening the door further. He explained that he was literally "stuck" and could not move forward. He characterized this situation as a "static" situation or a "pinch point". Mr. Moody suggested that the only way he had to get out of this "pinch point" was to push the door back toward the door frame, into the encroachment area, and step around the door, which caused him to step into the area where the stairs where. Mr. Moody, concluded that even when the width of the exit corridor was 18 inches when the door was 75% open, a dangerous condition existed which very likely was the cause of plaintiff's accident.

Mr. Moody also stated there was no purpose to having two exits to unit 110B and the kitchen exit, which was dangerous, could have been eliminated. He also opined that the primary way to resolve the dangerous condition presented by the kitchen exit was simply to have the exterior door open outward to the porch instead of inward to the corridor.

The defendant's expert, Mr. Horner, focused exclusively on his opinion that the exit at issue was code compliant and that Mr. Moody had misinterpreted the code when he stated that the minimum width requirement was 44 inches instead of the 36 inch requirement that was eventually agreed on by both parties. As stated above, Mr. Moody corrected his opinion as to the minimum width requirement during rebuttal and he used the 36 inch figure when he reached his conclusion that the exit area was not code compliant and that it was dangerous. Mr. Horner's opinion that the exit area was compliant with § 1012.1.5 was stated

as follows:

> Q.   Now, does the landing area and the exterior door off the landing area going outside to unit [110B] comply with this section [§ 1012.1.5]?
>
> A.   Yes, sir, it does.
>
> Q.   Did you actually open the exterior door into the landing?
>
> A.   Yes, sir.
>
> Q.   And did you find that the landing width was reduced to less than one-half the required width?
>
> A.   No sir, not at all.
>
> Q.   Did you actually check for that?
>
> A.   I measured. I've got several measurements, and actually I don't want to present it to the jury, but a hand-sketched drawing. I'm no artist.

The foregoing colloquy was the full extent of Mr. Horner's explanation of his opinion that the exit area was complaint with § 1012.1.5 of the code. He did not provide any support for his opinion such as the actual measurements he made or the diagram he referred to. He never stated that the exit area was safe or free of hazzard.

Mr. Horner did not address plaintiff's theory that when the door was opened to 75%, a "pinch point" was created, where the person opening the door had no more room in which to pull the door open to 100% nor did he refute Mr. Moody's opinion that the exterior door could have been installed to open outward toward the porch rather than inward to the exit area, thus resolving the dangerous condition, other than to say that the fact that the door opened inward did not violate the code.

While Mr. Horner was testifying on direct examination regarding the requirements of § 1012.1.5 and table 1004 and his opinion that the exit area was not a "exit access corridor" he was asked by counsel if he had consulted "any professional resources available to the building code inspectors to assist you in your evaluation of this?" He responded that "I did call the International Code Council (ICC), and I spoke with them." Counsel for plaintiff objected to any reference to what Mr. Horner had been told when he made this call and the

trial court sustained the objection.[1]  Later, counsel for defendant made the following offer of proof:

> The proof that would have been offered during the direct examination of Mr. Jay Horner.  The proof was excluded following a sustained hearsay objection by Mr. Ripley.  The proof that would have been offered through Mr. Horner was that Mr. Horner consulted certain professional resources available to building code inspectors to assist him in making the determinations that he made and for which he testified. He would have testified that he consulted professional representatives of the International Code Council, Birmingham, Alabama.  He would have testified that he regarded this resource as authoritative and reliable in his field in that the International Code Council is responsible for drafting the building codes pertinent to the issues in this case, as well as the commentary to those codes.  He would have testified that the consultation he would have received from that resource is something that he regularly does. From time to time he requires assistance, as do other members of his profession. He would have testified that information he would have received from this resource is of a type reasonably relied upon by members in his particular field in forming opinions regarding the proper interpretation of the standard building code.  He would have testified that after making that contact, the manner by which he evaluated this landing area and the manner by which he measured this landing area, he received instruction on how to do that from this resource, and the way he did it conformed to the instruction on received from the ICC, which drafted the code and content.

> The issues on appeal are:

> A.     Whether the Trial Court erred when it ruled that defendant's expert witness could not testify about the statements of a representative of the International Code Council regarding the interpretation of the building code?

> B.     If the Trial Court's exclusion of the expert witness's testimony was error, was it harmless error?

Questions pertaining to the admissibility of expert testimony are matters left to the trial court's discretion. *Brown v. Crown Equipment Corp,* 181 S.W.3d 268, 273 (Tenn. 2005).  Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." *Eldridge v.*

---

[1]At this junction in the trial, the better practice would be to conduct a jury-out proceeding and allow the witness to testify in order that the record may contain the exact evidence that the Trial Court finds objectionable.

*Eldridge,* 42 S.W.3d 82, 85 (Tenn.2001). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Id.*

The trial court's conclusions of law are reviewed under a purely *de novo* standard with no presumption of correctness. *Taylor v. Fezell,* 158 S.W.3d 352, 357 (Tenn. 2005)*, Union Carbide Corp. v. Huddleston* 854 S.W.2d 87, 91 (Tenn. 1993).

The standard of review of a jury verdict is well settled and is set out in Tennessee Rule of Appellate Procedure 13(d), which provides, "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." *See Whaley v. Perkins,* 197 S.W.3d 665, 671 (Tenn. 2006).

Defendant insists the Trial Court abused its discretion when it barred Mr. Horner from testifying about the statements an official or officials of ICC made to him before the trial regarding the proper way to evaluate and measure the exit area under the provisions of the building code.

In *Godbee v. Dimick* , 213 S.W.3d 865 (Tenn. Ct. App. 2006) the Trial Court permitted the defendant doctor to admit into evidence an open opinion letter from a physician who was not present to testify. In that letter the defendant doctor's partner stated that he had been asked to review plaintiff's MRI scan and that he believed he would have read the scan essentially the same as the defendant doctor. The letter was introduced at trial without the presence of the doctor who wrote the letter and was used to bolster the defendant doctor's position that he was not negligent in his assessment of plaintiff's MRI scan. On appeal, the plaintiff argued that the open letter was inadmissible hearsay. The Court of Appeals held that the letter was hearsay and that there was no exception to the hearsay application. Whether the testimony would have been permitted under Tenn. R. Evid. 703 was not discussed by that Court.

Here, the proffered testimony of Mr. Horner regarding what the ICC official told him was also hearsay as it was a statement made by the ICC official out of court and the statement was being offered to establish that the methodology used by Mr. Horner and his ultimate conclusion that the area at issue was code compliant was correct. As the ICC official's statements were hearsay, the Trial Court was correct in ruling the testimony was barred unless it was admissible under another statute or law.

Defendant contends that the proffered testimony regarding Mr. Horner's conversation with the ICC official is admissible under Tenn. R. Evid. 703. Rule 703 provides:

[1]The facts or data in the particular case upon which an expert bases an opinion or

inference may be those perceived by or made known to the expert at or before the hearing. [2]If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. [3]Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. [4]The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703(numbering supplied).

Rule 703 of the Tennessee Rules of Evidence contemplates three possible sources from which an expert may base his/her opinion: (1) information actually perceived by the expert; (2) information made known to the expert by others; and (3) information reasonably relied upon by experts in the particular field. *See* Tenn. R. Evid. 703; *see also* Neil P. Cohen, *et. al., Tennessee Law of Evidence* §§ 7.03(3), 7.03(4), 7.03(5) (5th ed.2005). Rule 703 contemplates that inherently reliable information is admissible to show the basis for an expert's opinion, even if the information would otherwise constitute inadmissible hearsay. It is not uncommon for an expert witness's opinion to be based on facts or data that are not admissible into evidence but are reliable. Neil P. Cohen *et al., Tennessee Law of Evidence* § 7.03(4); *see also Duran v. Hyundai Motor America, Inc*., 271 S.W.3d 178, 197 (Tenn. Ct. App. 2008)(experts may base their opinions on information provided to them by others pursuant to Tenn. R. Evid. 703).

Before Mr. Horner tried to testify about his conversation with the ICC official, he had testified that he had determined that the building code provided that the required minimum width of the exit area at issue was 36 inches and that he had obtained this information from Table 1004 of the code. He stated that the exit area was in compliance with the code. He acknowledged that plaintiffs' expert, Mr. Moody, had testified that the required minimum width for the area was 44 inches and that, as the area was less than 44 inches, it was not code compliant. Directly following this testimony regarding the code provisions for the width of the exit area he was asked:

Q.    Now, Mr. Horner, did you consult any professional resources available to the building code inspectors to assist you in your evaluation of this?

A.    To be perfectly honest with you, I felt that I was correct in my reading of it, but I did call the International Code Council, and I spoke with them.

At that point, plaintiffs' counsel entered an objection to hearsay which the Trial Court sustained, and the defense counsel then stated the substance of what Mr. Horner would have testified in his consultation with the ICC official. Although the offer of proof could have been more specific, it is sufficient to show that the ICC official identified for Mr. Horner the code provisions that were applicable to his measuring and evaluating the exit area. This information comports with the "facts or data" received from others that Tenn. R. Evid. 703 permits an expert to rely on which would otherwise be inadmissible.

In *Willamette Industries, Inc. v. Tennessee Assessment Appeals Com'n*, 11 S.W.3d 142, 150 (Tenn. Ct. App.1999) the Trial Court allowed an expert real estate appraiser to provide an opinion of real property value, which was based in part on conversations with buyers and sellers of comparable properties, despite a hearsay objection. *Id*. at 147. The Court of Appeals sustained the admission of the expert's testimony, including the oral statements made to him prior to trial by the buyers and sellers as follows:

> The record indicates that obtaining information from buyers and sellers of property is a common practice utilized by real estate experts in forming opinions such as those at issue in the instant case. Therefore, in accordance with the above-quoted language from Rule 703, the County's witnesses were entitled to rely upon the facts and data in question. Furthermore, although the record certainly contains some testimony contrary to that offered by the County's witnesses, it does not reflect such a lack of trustworthiness as to render the testimony of the County's witnesses inadmissible. Willamette's argument on this point is found to be without merit.

*Id*. at 150.

Plaintiff urges the Court to sustain the Trial Court's ruling based upon his argument that Mr. Horner's testimony was consistent with an opinion offered by the ICC official rather than "facts or data" as allowed by Rule 703. However, there is nothing in the offer of proof regarding an opinion from the official, but rather the offer simply states that Mr. Horner received instructions regarding the method of measuring the area from the official. Instructions regarding measurement based on a building code is factual rather than opinion. Defendant sought to introduce, through the testimony of Mr. Horner, information he gained from another that would support his reliance on certain parts of the building code when he conducted measurements and formed his opinion. As long as the rest of the criteria set forth in Rule 703 is present, this testimony should have been allowed by the Trial Court.

The remaining requirements of Rule 703 are satisfied. The second requirement is that the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject". The offer of proof shows that Mr. Horner,

a government building inspector, would have testified that he considered the ICC officials "authoritative and reliable in his field" as the ICC is responsible for drafting the building code and commentary to the code pertinent to the case. Mr. Horner would also have testified that he regularly consulted with representatives of ICC from time to time as do other members of his profession. He also would have testified that information he received from ICC was of a type reasonably relied upon by members in his particular field in forming opinions regarding the proper interpretation of the building code. Mr. Moody, an architect, also testified that he recognizes the expertise of ICC officials, that he consults with the officials for interpretations of the code and that they are "valuable members of the team".

The third requirement of Rule 703 is that the probative value of the proffered facts or data that are otherwise inadmissible should outweigh their prejudicial effect. This requirement was clearly met at the time Mr. Horner attempted to offer testimony regarding his call to ICC and at the time the offer of proof was made. At the time of the attempted testimony and the hearsay objection there was a critical difference in the opinions of the testifying experts. Mr. Moody maintained the building code had a minimum width requirement of 44 inches for the exit area and that the area was not compliant with that requirement. Mr. Horner insisted that according to Table 1004, the minimum width requirement was 36 inches and that the area was code compliant. Further, each expert characterized the exit area in a different manner which apparently resulted in the use of different criteria for evaluation of the area. Mr. Moody called the area at issue an "exit access corridor" while Mr. Horner called it a "landing" or an "exit access". If the information or instructions from the building code Mr. Horner received from the ICC official could resolve this discrepancy, the information would have been helpful to the fact finder. Hearsay evidence is generally thought to be prejudicial to the party not offering it because the declarant is unavailable at trial for cross-examination. Plaintiff's counsel, could have cross-examined Mr. Horner as to the conversation and also could have elicited testimony from his own expert about the validity of the hearsay evidence. On balance, the probative value of the testimony to the fact finder outweighs the prejudice to plaintiff.

The fourth requirement of Rule 703 is that the facts or data relied upon be trustworthy. As the information came from the ICC, the drafter of the building code, it came from an authoritative and reliable source. Plaintiffs neither presented evidence that the information would not be trustworthy nor did they raise any objection to the reliability of the source of the information. Accordingly, the requirements of Rule 703 were met and the Trial Court abused its discretion when it sustained plaintiffs' hearsay objection.

Although the trial court abused its discretion when it barred Mr. Horner from testifying about the facts or instructions he received from the ICC official, the error was harmless. As discussed, at the time Mr. Horner attempted to testify regarding his

conversation with the ICC official and at the time the offer of proof was made, the parties' experts' opinions differed as to the character of the exit area and also the minimum required width of the area. However, these differences were resolved when Mr. Moody, on rebuttal, agreed with Mr. Horner's assertion that the minimum required width was 36 inches and when Mr. Horner stated that whether the area at issue was a "exit access corridor" or a "exit access" was of no import to the issues before the Court as the code required both to have a minimum required width of 36 inches. Mr. Moody, also later agreed that the width of the exit met the codal requirements, a significant difference from his earlier stated opinion. As the experts' opinions regarding measuring the area and the required width of the area were reconciled, any facts or information that was provided by the ICC official was not needed to assist the trial of fact on these issues, thus the error of the Trial Court in barring that testimony was harmless.

Plaintiff's expert demonstrated that, although the width of the exit area met the code requirement, the area was in violation of § 1012.1.5 of the building code and that a "pinch point" situation occurred when the exterior door was opened into the area, creating a dangerous condition. Plaintiff's expert also opined that the kitchen exit, which he demonstrated to be dangerous, was not needed as there was another exit from Unit 110B. He further offered the opinion that the dangerous condition of the exit area could easily be remedied by having the exterior door open outward to the porch of the cabin rather than inward to the exit area. Mr. Horner also testified that if a sign had been posted at the interior door warning that there were stairs in the exit area immediately to the right of the door, the accident could have been prevented. Defendant's expert stated, but did not demonstrate to the jury, that the area did not violate § 1012.1.5 of the building code. He never offered an opinion that the exit area was safe for its intended use, nor did he refute Mr. Moody's suggestions regarding how to remedy the situation. Accordingly, there was ample material evidence to support the jury's verdict.

We affirm the Judgment of the Trial Court and remand, with the cost of the appeal assessed to defendant Westgate Resorts, Ltd.

_____
HERSCHEL PICKENS FRANKS, P.J.