DECISION
Before this Court is an appeal by David A. Marcantonio, D.D.S. ("appellant") from a decision of the Rhode Island Board of Examiners in Dentistry ("Board"), suspending his license to practice dentistry for a minimum of two years due to unprofessional conduct in violation of G.L. 1956 § 5-31.1-10. Jurisdiction in this Court is pursuant to G.L. 1956 § 42-35-15.
 I FACTS AND TRAVEL
The appellant has been a licensed dentist in the State of Rhode Island since 1986. For most of his career, appellant was also a participating provider with Delta Dental of Rhode Island ("Delta Dental"). Beginning in December 2006, Delta Dental received three complaints in a twelve month period regarding the quality of appellant's treatment. The complaints prompted Delta Dental to undertake an audit of appellant's office. In January 2008, Delta Dental obtained the treatment charts and X-rays of ninety-five patients. *Page 2 
On February 22, 2008, Dr. James Balukjian, Dental Director for Delta, filed a complaint letter with the Chairman of the Board of Dental Examiners and with the Director of the Department of Health. (Appellant's Ex. D.) In his letter, Dr. Balukjian alleged that the audit revealed "a disturbing pattern of quality of care issues, negligence, fraud, and record-keeping violations." Id. In addition, Dr. Balukjian opined that the appellant "pose[d] a risk to his patients," and requested that the Board revoke his license to practice dentistry. Id
On March 11, 2008, the Board issued a summary suspension of appellant's dental license pursuant to its authority under § 5-31.1-19.[1] (Appellant's Ex. E.) On March 13, 2008, the appellant received a temporary restraining order permitting him to continue to perform cleanings and fillings, but prohibiting him from undertaking new patients requiring crowns, bridges, or root canals. (Appellant's Ex. F.) The temporary restraining order also required appellant to receive written approval from an independent dentist before performing crown, bridge, or root canal work on current patients. Id. The parties chose Dr. Stephen Skoly to act as the independent supervisory dentist.
A properly noticed hearing was commenced on April 2, 2008. Six sessions were conducted over the course of three months, with the final session held on June 18, 2008. Bruce W. McIntyre, Esq. presided over the hearings, which included documentary evidence and the testimony of four witnesses. The Board's four member Hearing Panel, composed of professionals in the dental field, also was present. At the outset, the parties agreed to consolidate *Page 3 
the appeal of the summary suspension, relating to whether appellant constituted an immediate danger to the public, with the substantive charges relating to appellant's license. (4/2/08 Tr. 7.)
 Testimony of Julie Ferrini
The State's first witness was Julie Ferrini, the Director of Program Integrity at Delta Dental. Ms. Ferrini's duties at Delta Dental involve oversight of the various clinical departments, including case management, appeals, fraud and abuse, complaints and grievances, and audits. (4/2/08 Tr. 12-13.) Ms. Ferrini testified that Delta Dental had received three consumer complaints against the appellant within a twelve month period and that Delta Dental's Quality Care Committee had voted to terminate the appellant's status as a participating provider and to conduct an audit of appellant's practice. Id. at 13-14.
During her testimony, Ms. Ferrini explained the methodology Delta Dental used to audit appellant's practice. Id. at 14. This involved identifying Delta Dental members treated by appellant who had received "major restorative services and endo[dontic] procedures," such a "crowns, bridges, and root canals," during the years 2004 and 2005. Id. Ninety-five such patients were identified, and their complete files, including any X-rays, were copied by three clinical auditors. Id. at 15. Dr. Balukjian then reviewed the findings of the audit. Id. at 16.
 Testimony of Dr. Balukjian and Dr. Marcantonio
Dr. Balukjian testified as the dental expert for the State. In addition to his Director position at Delta Dental, Dr. Balukjian has been a practicing dentist in Rhode Island since 1977.Id. at 39. Dr. Balukjian explained that he was asked to select ten patient files out of those he personally reviewed during the audit to constitute the State's case against the appellant.Id. at 48. The vast majority of Dr. Balukjian's testimony consisted of reviewing appellant's treatment of the ten patients. The appellant testified on his own behalf, responding to Dr. Balukjian's *Page 4 
allegations and generally defending his treatment of the same ten patients. The Court will proceed to summarize the testimony regarding each patient in turn.
 Patient JC
Dr. Balukjian first testified regarding the appellant's treatment of Patient JC, [2] expressing concern with the quality of care relative to a four-unit fixed bridge involving tooth numbers seven through ten. Id. at 50. According to Dr. Balukjian, tooth number seven showed "open margins" and decay only a year after the bridge was inserted. Id. at 51. "Open margins," Dr. Balukjian explained, is a term used when a dental crown does not properly fit the natural tooth structure. Id. at 52.
Dr. Balukjian testified that the patient's X-rays showed that while appellant had extracted tooth numbers eight and nine, he had left the roots in place, a practice which could lead to serious consequences, such as an "infection underneath the bone" that "could get into the brain pretty quickly." Id. at 53. Furthermore, Dr. Balukjian noted that when Delta Dental requested treatment notes from appellant explaining what had happened to these teeth, appellant rewrote the treatment chart. Id. at 54-55.
On cross examination, Dr. Balukjian explained again why leaving a complete root in the jaw after breaking off the crowns during an extraction does not meet the applicable standard of care. (4/23/08 Tr. 58.) He testified that he never spoke to appellant or to the patient as to why he left the roots behind.Id. at 59. However, Dr. Balukjian disagreed with appellant's counsel's suggestion that the roots were encased in bone and stated that the risk of removing the roots would be similar to a simple extraction. Id. at 67, 69. If the patient had refused treatment, Dr. Balukjian explained that he would "definitely document that." Id. at 74. With respect to the two different sets of treatment records, Dr. Balukjian concluded that appellant rewrote detailed *Page 5 
treatment chart notes for Delta Dental to make them appear like "what normal treatment chart notes look like from his office."Id. at 61-62.
During his testimony, appellant responded to the allegation that he committed fraud by submitting two separate versions of the patient's treatment notes to Delta Dental. He explained that he rewrote the treatment notes for the benefit of the dentist who was taking over the case in order to make them more legible but had failed to make a notation in the chart that the notes were rewritten. (5/28/08 Tr. 79-80.)
With respect to the allegations concerning his treatment of tooth numbers eight and nine, appellant testified that the teeth were starting to get dark because of "external root resorption" and that the patient's primary concern was with their appearance.Id. at 82. The appellant stated that his course of treatment — removing the teeth, placing a bridge, but leaving the roots intact — was "the most aesthetic way to go about bringing back her smile." Id. at 83. The appellant testified that leaving the roots in place was not a risk to the patient because they were starting to be encapsulated in bone and there were no signs of infection. Id. at 84-85. The appellant also testified that he reimbursed the patient when she was not pleased with the appearance of the new bridge. Id. at 87.
On cross examination, the appellant testified that he rewrote the treatment chart of this patient a year and one-half after treatment was rendered based upon his memory and input from the patient. (6/5/08 Tr. 39-40.) The appellant testified that the only substantial difference between the two versions is that the rewritten chart shows an extraction performed in 2004, which the original chart does not. Id. at 46. The appellant admitted that, with respect to this patient, he did not comply with the minimal standard of care regarding record keeping, adding that his "record-keeping is awful." Id. at 47. *Page 6 
 Patient "JG"
In reviewing appellant's treatment of Patient JG, Dr. Balukjian first noted untreated decay over several years in tooth number four. Untreated decay, Dr. Balukjian opined, is a problem because it "can get larger and then encroach upon the pulp and the nerve of the tooth" and could result in the tooth being lost or the need for a root canal. (4/2/08 Tr. 61.) Dr. Balukjian also pointed out untreated decay under restorations appellant had placed on tooth numbers eight and fourteen. In addition, Dr. Balukjian testified that tooth number thirty showed untreated decay and underfilled canals following a root canal procedure. Overall, Dr. Balukjian testified that appellant's treatment of "JG" did not meet the minimum standard of care in dentistry.
On cross examination, Dr. Balukjian reiterated that he took issue with appellant's treatment of four teeth. As to the issue of untreated decay, Dr. Balukjian stated, "I don't know why a dentist would look at three successive years of X-rays and see decay getting larger on a tooth and not do something about it." (4/23/08 Tr. 78.) If the patient refused to have the tooth treated, Dr. Balukjian testified that it would be the standard of care to note that fact in the record and suggest that the patient find another dentist. Id. at 80. Dr. Balukjian explained that some treatment, like removal of decay, is "not elective" and "needs to be done or there's going to be complications." Id. at 80-81. As to the issue of root canals, Dr. Balukjian explained the risk of underfilled canals and agreed that if the patient's tooth was asymptomatic after several years with no radiographic evidence of infection, that it could probably be categorized as a successful procedure. Id. at 94.
During his testimony, appellant addressed allegations of untreated decay in several teeth, stating that JG had "rampant decay" when he first came to him in 2000 and that, as such, *Page 7 
appellant had to "pick and choose" which teeth to work on first. (5/28/08 Tr. 70.) The appellant testified that he had worked on nearly every tooth in the patient's mouth. Id. at 71. Regarding the allegation that the root canal performed on tooth number thirty was underfilled, appellant agreed that "the fill is rather thin," but insisted that it was "adequate" and noted that the tooth has been asymptomatic since the procedure was performed.Id. at 74. The appellant added that he performed two root canals on this patient and the patient had not called with any complaints. Id. at 77.
 Patient "KG"
Dr. Balukjian next testified regarding appellant's treatment of Patient KG, first noting that the patient's X-rays revealed "a lot of untreated decay" especially in tooth numbers two, three, four, and thirteen, which he characterized as "significant" because it "extend[ed] beyond the enamel dentin junction." (4/2/08 Tr. 68-69.) Dr. Balukjian also testified that appellant billed Delta Dental for restorations in certain teeth that, according to his reading of the X-rays, were never done.Id. at 71. Dr. Balukjian further noted untreated decay in tooth number twenty-nine that "might be into the pulp" and require a root canal or extraction, as well as incomplete removal of decay under restorations in tooth thirty and thirty-one.Id. at 72-73.
On cross examination, Dr. Balukjian testified that the patient had severe decay in nine teeth that was largely left untreated. (4/23/08 Tr. 97.) In addition, he stated that all but one tooth could have been treated with regular restorations and observed that while the patient chart shows that the patient cancelled one appointment, there was no other record of cancelled appointments.Id. at 101.
Addressing allegations of untreated decay, appellant testified that KG has Crohn's disease, which makes his saliva more acidic than normal and therefore results in "more rapid *Page 8 
breakdown of the tooth structure." (5/28/08 Tr. 13.) The appellant also explained that, in some instances, what might appear as decay on an X-ray may be reduced bone density and that one would need to perform a clinical examination to know for certain.Id. at 19. The appellant agreed with Dr. Balukjian that the patient has decay in tooth numbers two, three, four, and thirteen, but the reason no treatment was rendered is that the patient had not been to his office since August of 2007. Id. at 22. As to tooth number thirty-one, appellant testified to the presence of an open margin and decay but explained that both open margins and decay can develop after a crown is placed, even if it is placed properly.Id. at 26. Furthermore, appellant testified that he had treated tooth number twenty-nine and was going to crown tooth number thirty, but the patient did not come in for treatment.Id. at 29.
On cross examination, when asked why he did not treat the significant decay in a number of this patient's teeth, appellant testified that he often has to prioritize his treatment and address what is bothering them at that time. (6/5/08 Tr. 64.) The appellant testified that while he does this in practice, he does not note how treatment is prioritized in the patient's chart. Id.
 Patient "MK"
Dr. Balukjian next testified regarding numerous problems associated with appellant's treatment of Patient MK. Among the problems Dr. Balukjian identified were untreated decay under a filling in tooth number two, a "peri-apical radiolucency" in tooth number eleven that had been neither documented nor treated, and an open margin and decay on tooth number thirty that had not been treated over the course of several years. (4/2/08 Tr. 74, 79-80, 82.)
In addition, Dr. Balukjian testified that appellant billed Delta Dental for "full porcelain crowns" in tooth numbers three, twenty-nine, and thirty-one when the appellant had, in fact, not put in full crowns but some lesser form of restoration. When asked about how this practice *Page 9 
might impact the patient, Dr. Balukjian stated that the appellant "billed for a service that he didn't perform" and that consequently the patient would lose "benefit dollars by Delta paying for something that wasn't done." Id. at 76. Furthermore, Dr. Balukjian observed that appellant billed for a "porcelain fused to metal full crown" on tooth number six in September 2004, but X-rays from two months later show no crown present on the tooth, only decay.
On cross examination, Dr. Balukjian was asked principally about the billing issues relative to this patient. Referring to Delta Dental's fee schedule, Dr. Balukjian testified that the reimbursement differential between a "full crown" and a "three-quarter crown" is $100 and that in his opinion appellant committed fraud when "he submitted a claim for a procedure he didn't do." (5/14/08 Tr. 12.) When asked whether Delta Dental provides participating dentists with descriptions of those terms, Dr. Balukjian testified that they do not, but noted that "any dentist that's a licensed dentist, been to dental school, knows the difference between a full crown and something other than a full crown" and added that "Delta Dental would [not] necessarily need to have to define each one of these procedures." Id. at 15.
The appellant testified that MK had been a patient of his since 1989. Describing the general condition of her teeth, appellant testified that MK "had a lot of restorations over the years" and "doesn't have the strongest oral hygiene." (5/28/08 Tr. 31.) The appellant agreed that there was extensive untreated decay in tooth number two, but explained that tooth number three was the main concern at the time because the patient had fractured a filling.Id. Referring to the X-rays, appellant disputed Dr. Balukjian's opinion that he had never placed a full crown on tooth number three. Id. at 34. The appellant testified that he had made the particular crown himself using a "cerec machine," which creates porcelain restorations, and that he had used what he felt to be the appropriate reimbursement code from the manual given to him by Delta Dental. *Page 10 Id. at 34-36. He also stated that the Delta Dental manual was given to him back in 1987, and he never received any updates or informational sessions on how to use it. Id. at 37. In addition, appellant testified that there are seventeen different types of crowns listed in the manual and that he used his best judgment when billing Delta Dental. Id. at 48, 51-52.
With respect to tooth number twenty-nine, appellant testified that he failed to note in the patient chart when he replaced the crown because he's "not the best record-keeper in the world."Id. at 56. However, he testified that he did not charge the patient or Delta Dental for the replacement because a dentist can only charge for a crown on a particular tooth once every five years.Id. at 57. In response to allegations that 2004 X-rays show open margins and decay present under certain restorations, appellant reiterated that it is possible "to develop an open margin or even decay in a properly-placed crown" two years after the procedure.Id. at 63. The appellant also explained that the backwards timing of submitting a claim for a "custom post and core and crown" had nothing to do with how he performed the procedure.Id. at 64-65. On cross examination, when asked why he billed for a full crown on tooth number six, when subsequent X-rays show no crown on that tooth, appellant testified that he placed a crown on tooth number four, but inadvertently wrote in his charts that he placed it on tooth number six. (6/5/08 Tr. 49.)
 Patient "FL"
Dr. Balukjian next addressed Patient FL, focusing on two teeth on which appellant had performed a root canal. Dr. Balukjian first noted an underfilled canal system in tooth number thirteen, explaining that in most circumstances underfilling the canal system does not conform to the standard of care because it creates a "potential area for bacteria to get in and recreate an infection." (4/2/08 Tr. 88.) In addition, appellant's billing sequence for fabrication of a crown and post and core deviated from standard practice in the industry. *Page 11 
Dr. Balukjian similarly noted an underfilled canal system in tooth number thirty, as well as the possible presence of a broken instrument. Furthermore, Dr. Balukjian testified that FL's treatment chart and X-rays from subsequent years showed a "chronic infection" in the area and that appellant should have referred FL to a specialist rather than merely treating him with antibiotics.Id. at 88-93.
On cross examination, Dr. Balukjian testified that tooth number thirteen, which he had characterized as having an underfilled canal system, must have become symptomatic two years after the procedure because an "electric pulp test" was performed on that tooth, which he felt was "a little strange." (5/14/08 Tr. 22.) When asked to assume that the patient was asymptomatic two years after the root canal, Dr. Balukjian testified that, while he hadn't examined the patient, he "would say so far, so good." Id. at 25.
Dr. Balukjian also reaffirmed that tooth number thirty had a "peri-apical radioluceny" and that appellant should have referred the patient to a specialist for treatment. Id. at 26-27. Dr. Balukjian testified that appellant did eventually refer the patient to a specialist "[o]nly after being encouraged very strongly by Delta to do that." Id. In addition, Dr. Balukjian stated that he spoke personally with appellant about the issue, and that he recalls appellant telling him that the patient did not want to see a specialist. Id. at 28. Dr. Balukjian testified that he did not insist that any particular procedure be performed on the patient, only that the patient be evaluated by a specialist.Id. at 29-30, 32.
The appellant testified that FL had been a patient of his for seven years. In response to the issues raised by Dr. Balukjian, appellant testified that the canals of tooth number thirteen "may have been underfilled," but explained that there could have been a "good reason" why, explaining that the canals could have been tight "due to constriction" or that "particles may have *Page 12 
gone down and placed a plug" while he was cleaning out the canal. (5/14/08 Tr. 94.) The appellant added that the patient still has the tooth to this day and has only come in for palliative treatment. The appellant noted that the "EPT" in his charts that Dr. Balukjian characterized as "electric pulp test" during his testimony really stands for "emergency palliative treatment." Id. at 96. Aside from minor palliative treatment, appellant testified that after the root canal was performed, the patient had not complained of pain or received other treatment. Id. at 101.
With respect to tooth number thirty, appellant did not recall breaking an instrument in any of the teeth he has ever worked on and disputed Dr. Balukjian's suggestion that there was a broken instrument in the canal. Id. at 103. The appellant also disagreed with Dr. Balukjian's assertion that tooth number thirty was underfilled, stating that the "mesial canal may be a touch — a millimeter or two short, but there's still a seal there."Id. at 105.
As to the radiolucency that was still present in tooth number thirty a year and one-half after the root canal, appellant testified that he decided to "take a conservative route" and place the patient on an antibiotic since the patient was not complaining of any pain, and there were no other symptoms. Id. at 107. The appellant further testified that he disagreed with Dr. Balukjian that the radiolucency was getting larger and did not feel that an apicoectomy — the surgical removal of the dental root apex — was required. Id. at 112. He also stated that the specialist to whom he referred this patient agreed with his course of treatment, but Delta Dental nevertheless insisted that an apicoectomy be performed. The appellant then explained that the tooth broke during the procedure and that the patient will most likely need to have the crown replaced. He also disagreed with Dr. Balukjian's assertion that allowing decay to remain on a patient's tooth violates the standard of care in dentistry. (5/28/08 Tr. 10.) *Page 13 
 Patient "JM"
Dr. Balukjian's allegations regarding patient JM mainly involve billing issues. Dr. Balukjian first testified that appellant billed for a full porcelain crown on tooth number twenty in September 2003, but films from 2005 show no crown on the tooth at all. When asked whether it was conceivable that the crown fell off, Dr. Balukjian testified that "usually you can tell a tooth has had a crown on it, because it's smaller, because [the] tooth head structure's been removed," but in this case the "mesial surface ha[d] not been touched." (4/2/08 Tr. 94.) In addition, Dr. Balukjian stated that appellant submitted a claim for a crown on tooth number twenty-two in 2003, yet later x-rays show no crown on that tooth but one on tooth number twenty. Finally, Dr. Balukjian testified that appellant submitted a claim and received reimbursement for the extraction of tooth number twenty-eight in 2004, but that X-rays from a year later show that the tooth is still there.Id. at 96.
Responding to why he billed for an extraction of tooth number twenty-eight, when later X-rays show the tooth still there, appellant testified on cross examination that he made a record keeping error, explaining that "it's quite possible that I may have written down 28 and 29 [was] the tooth I extracted." (6/5/08 Tr. 55.) In addition, appellant testified in defense of alleged fraud in connection with his claim for a full porcelain crown placed on tooth number twenty, stating that X-rays show no crown on that tooth because he had removed it in order to perform a root canal in September 2004, which is reflected in the patient's chart. Id. at 59.
 Patient "CR"
Dr. Balukjian testified regarding appellant's treatment of six teeth of Patient CR. Beginning with tooth number two, Dr. Balukjian testified that appellant billed for an all-porcelain crown, which brings a higher reimbursement than the porcelain-fused-to-metal crown *Page 14 
that was actually put in. As for tooth number three, Dr. Balukjian stated that appellant billed for a full crown when X-rays showed that what appellant put in was not a full crown, but some type of "cerec restoration" with open margins. (4/2/08 Tr. 97.) Dr. Balukjian testified that X-rays over a four year period of tooth number thirty show no treatment of recurring decay. With reference to tooth numbers nineteen and thirty-one, Dr. Balukjian testified that Delta Dental paid for crowns which later X-rays showed not to be present. Id. at 99-100. Finally, with respect to tooth number fourteen, Dr. Balukjian stated that a claim was submitted for an all porcelain crown when X-rays showed a porcelain-fused-to-metal crown. Id. at 100-101.
The appellant was not asked questions about patient CV on direct examination, but testified on cross examination that he disagreed with Dr. Balukjian's allegation that X-rays showed no crown present on tooth number nineteen. The appellant explained that he had performed a "cerec" restoration on the tooth. (6/5/08 Tr. 62.)
 Patient "LT"
Regarding patient LT, Dr. Balukjian testified that appellant submitted claims and was reimbursed for full crowns for tooth numbers nineteen, twenty-eight, and thirty-one, which subsequent X-rays showed not to be present. (4/2/08 Tr. 102.) In addition, he explained that tooth number fifteen showed some type of restoration that was billed as an all porcelain full crown but which is not a full crown. Dr. Balukjian made a similar finding with respect to tooth number eighteen. Dr. Balukjian testified that in some instances appellant was reimbursed $800 for full crowns when the restoration he actually performed would only bring $85 to $110. (5/14/08 Tr. 67.)
On cross examination, Dr. Balukjian testified that he believed appellant's submissions for reimbursement involving the five teeth in question constituted fraud. (5/14/08 Tr. 39.) In *Page 15 
addition, he stated that his observation that appellant had billed for full crowns but had actually put in some other type of restorations was based upon review of the patient's chart and x-rays, but not upon a clinical examination of the patient.Id. at 44.
During his testimony, appellant responded to Dr. Balukjian's allegations of fraudulent billing regarding patient LT. He admitted to billing Delta Dental for full crowns in four instances when he had performed a lesser form of restoration called a "MOD onlay," which is something "more than a filling but not as much as a crown." (6/5/08 Tr. 17.) However, appellant claimed these to be "a billing error" and noted that the reimbursement rate between the two procedures was about $140. Id. at 18-19. The appellant also stated that he was using a handbook from 1989 that did not have a code for the type of restoration he performed. Id. at 23.
On cross examination, appellant acknowledged that he inappropriately billed Delta Dental on four separate occasions because he wasn't sure which code to use. Id. at 33. The appellant testified that almost every restoration he did using the cerec machine, whether for this patient or any of the others, was billed under the all porcelain crown billing code, 2740.Id. at 34.
 Patient "RT"
Regarding the ninth patient, RT, Dr. Balukjian observed an underfilled canal system in tooth number five and a "very poorly filled root canal system" in tooth number six, "way short of the apex." (4/2/08 Tr. 105.) Dr. Balukjian also spoke of the risks associated with the underfilled canal in tooth number six, which include the risk of losing the tooth, reinfection of the bone, or developing an abscess. He further noted that a five unit bridge abutting tooth number six had "wide open" margins and was apparently poorly fitted. Id. at 106. As to tooth number eighteen, Dr. Balukjian noted a similar pattern of billing for a full crown when some other kind of *Page 16 
restoration was actually done. Id. at 107. With tooth number nineteen, Dr. Balukjian observed unfilled canals and "extensive decay" underneath the crowns. Id. On cross examination, Dr. Balukjian testified that he would generally consider a root canal procedure to be "successful" if it was asymptomatic with no complaints for several years. (5/14/08 Tr. 36.)
During his testimony, appellant addressed Dr. Balukjian's opinion that root canals performed on RT did not meet the customary standard of care. The appellant disagreed that the canal system in tooth five was underfilled and noted that the "patient has been asymptomatic" since the procedure was performed. (6/5/08 Tr. 7.) He also testified that a previous dentist had treated tooth number six. Regarding tooth numbers eighteen and nineteen, appellant testified that he performed root canals on those teeth but disagreed that they were underfilled, stating that they "fall within a millimeter of the apex." Id. at 10. Additionally, appellant stated that he placed full crowns on those teeth, contradicting Dr. Balukjian's statements that they were not full crowns. Id. at 10-11. The appellant testified that he recently replaced the crowns because the margins had opened and decay had formed, but that no decay was present, and the margins were sealed four years prior when the procedure was performed. Id. at 12.
 Patient "SV"
The last of the ten patients is SV, and Dr. Balukjian made findings with respect to three teeth. In Dr. Balukjian's opinion, the root canal performed on tooth number twenty-seven and twenty-eight did not conform to the minimally acceptable standard of care because X-rays showed that the root canal was "very underfilled" and "a lot of decay" had been untreated. (4/2/08 Tr. 109.) Dr. Balukjian also testified that Delta Dental was billed for a root canal treatment on tooth number thirty-one, but that the patient's chart and X-rays did not show root canal therapy took place. On cross examination, Dr. Balkujian testified that apart from "electric *Page 17 
pulp testing," there were no other entries in the patient's chart to indicate that the root canals appellant performed had become symptomatic.
The appellant testified that he performed root canals on tooth numbers twenty-seven and twenty-eight. He agreed that tooth number twenty-seven was not appropriately filled because of "calcification" of the canal but noted that the tooth had been asymptomatic ever since. (6/5/08 Tr. 25.) The appellant testified that tooth number twenty-eight presented a similar situation: it was calcified and the "root ha[d] a severe curve to it." Id. In addition, appellant disagreed that the canal system of tooth number thirty-one was underfilled and noted that the patient later came in for "palliative treatment" not "electronic pulp testing" as Dr. Balukjian had previously indicated. Id. at 26. On cross examination, appellant explained that the root canals on tooth numbers twenty-seven and twenty-eight were very difficult to perform due to calcification and that while he did them to the best of his ability, they were nonetheless underfilled.
 Testimony of Dr. Stephen Skoly
Dr. Stephen Skoly testified as an expert witness on behalf of the appellant. Dr. Skoly has been a licensed dentist in Rhode Island since 1988 and currently operates a specialty practice in oral and maxillofacial surgery. (6/18/08 Tr. 6.) Dr. Skoly was selected by both parties to act as an independent supervisory dentist for appellant during the time period when he was operating under a restraining order. Id. at 10.
A substantial portion of Dr. Skoly's testimony addressed the topic of untreated decay. He opined that "in some patients, the complete eradication of decay, for a multitude of reasons, might not be possible." Id. at 19. He discussed at length an article from the Journal of American Dental Association entitled "Treatment of Deep Carious Lesions by Excavation or Partial Removal." Dr. Skoly explained that "caries" is a dental term synonymous with tooth decay and *Page 18 
stated that "it's safe to say that, on the basis of studies cited in this review . . . there is substantial evidence that the removal of all infected dentin in deep carious lesions is not required for successful carious treatment, provided that the restoration can seal the lesion from the oral environment effectively."Id. at 24. Dr. Skoly conceded, however, that "before this concept is accepted generally by the dental profession, additional trials may be needed." Id.
Dr. Skoly then testified that he had reviewed the charts and X-rays of the ten patients and had also discussed the patients with the appellant. During his testimony, Dr. Skoly addressed three of the ten patients directly. With respect to Patient JG, he testified that based upon the records and X-rays, he saw no violation of the minimal standard of care. Id. at 42. However, Dr. Skoly noted that he was not satisfied with the quality of the X-rays and "a lot of the entries [in appellant's charts] are unreadable to me."Id. at 43. He also indicated that it would be important to physically examine the patient in order to make a full assessment. In addition, Dr. Skoly gave his opinion as to what constituted a successful root canal procedure, stating that a "root canal can be deemed successful for a patient with no symptoms, either objectively or subjectively, three or four years after the procedure" and that the approximate success rate for root canals is "anywhere from 85 to 90 percent." Id. at 44-45.
Dr. Skoly next addressed patient KG and concluded that he did not see a violation of the minimum standard of care. He testified that "there is evidence that . . . [appellant has] done restorations on multiple teeth, and our discussion was that because of [the patient's] Crone's [sic] disease, that dental decay was an issue and a problem." Id. at 47. Dr. Skoly also reiterated that he was unsatisfied with the quality and quantity of the X-rays.
As to Patient FL, Dr. Skoly discussed the radiolucency present on the 2005 X-ray and recounted his discussion with appellant.Id. at 49. He agreed with appellant's decision to *Page 19 
monitor and observe the tooth, since the tooth was asymptomatic, stating that it was "absolutely an appropriate treatment of choice."Id. at 50. Dr. Skoly objected to how Delta Dental allegedly insisted that the patient be referred to an oral surgeon for an apicoectomy and opined that "an insurance carrier should not be involved in the patient/doctor relationship like this in insisting on treatment when, perhaps, they're not completely aware of the whole situation. . . ." Id. at 51-52. Dr. Skoly went on to state that the patient has a "tremendous amount of say" in the course of treatment that he or she eventually receives from the dentist and "it's not as simple as having, you know, insurance analysts, so to speak, look at records and just say, this is the appropriate standard of care. This is what should have been done. Anything else is a violation of the standard of care."Id. at 53-55. Finally, Dr. Skoly disagreed with Dr. Balukjian's assessment that appellant poses a significant risk to the health, safety, and welfare of the people of Rhode Island as a practicing dentist. He testified that appellant should be allowed to continue to practice dentistry in Rhode Island, but that improvements are needed to appellant's record keeping and coding and reimbursement practices. Id. at 60.
On cross examination, Dr. Skoly testified that appellant's records "are, at times, incomplete" and specifically as it relates to Patient JG, he "absolutely" had difficulty reading the record.Id. at 61. Dr. Skoly stated that he rendered his opinions with the qualification that the records were, at times, illegible and incomplete. Id. at 62.
Dr. Skoly further testified that while he made an "overall assessment" of appellant's treatments of KG and JG, he did not form an opinion as to appellant's treatment of specific tooth numbers.Id. at 65. He agreed that his opinion might be incomplete because appellant's records, upon which his opinion was based, were incomplete, and he did not examine any of the patients.Id. at 71. *Page 20 
 The Board's Decision
On October 23, 2008, the Board issued a thirty-one page decision in which it upheld the summary suspension and found appellant guilty of unprofessional conduct under § 5-31.1-10. The Board concluded that "[t]he administrative record of the care rendered to the ten patients that were the subject of this hearing reveals a pattern of poor dentistry that falls well below the minimum standard of acceptable care." Specifically, the Board found that the evidence adduced at the hearings demonstrated the following:
 a. A pattern of a failure to refer to oral surgeons, endodontists and periodontists when indicated;
 b. Poor documentation, office management and fraudulent claim submissions;
 c. Untreated decay, undiagnosed pathology, inadequate root canals, and insufficient removal of decay under restorations;
 d. Testimony by the [appellant] that lacked veracity that is expected of a licensed dentist in the State of Rhode Island;
 e. Documentation fails to note the patient's chief complaint, diagnostic radiographs and required treatment plan;
 f. There is an absence of current diagnostic radiographs for procedures. Id.
In addition, the Hearing Committee made specific findings with respect to each patient. The Board imposed a two-year suspension, the maximum fine of $10,000, and ordered appellant to complete an ADA approved "Advanced Standing Program" and a course in proper documentation of clinical records.
On October 27, 2008, appellant filed a timely appeal of the Board's decision. Concurrently, appellant sought a stay of the sanctions imposed, which the Court denied. On October 29, 2008, appellant filed a writ of certiorari with the Rhode Island Supreme Court, seeking review of the denial of the motion for a stay. The writ was denied on October 31, 2008.
The appellant then filed a motion for leave to present additional evidence pursuant to § 42-35-15(e). The appellant sought to introduce evidence that three of the four board members *Page 21 
who heard his appeal, as well as the Board member who conducted the investigation, had been participating members of Delta Dental. On December 9, 2008, appellant's motion was denied. On January 22, 2009, appellant filed a petition for writ of certiorari seeking review of the denial of his motion. That petition was denied on February 26, 2009.
 II STANDARD OF REVIEW
Judicial review of the Board's decision by the Superior Court is authorized pursuant to § 42-35-15 of the Rhode Island Administrative Procedures Act. Section 42-35-15(g) provides that:
 The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions:
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
When reviewing an agency decision pursuant to § 42-35-15, the Court may not substitute its judgment for that of the agency with respect to credibility of witnesses or the weight of evidence concerning questions of fact. Center for Behavioral Health v.Barros, 710 A.2d 680, 684 (R.I. 1998); Mine Safety AppliancesCo. v. Berry, 620 A.2d 1255, 1259 (R.I. 1993). As *Page 22 
such, the Court's review is limited to "an examination of the certified record to determine if there is any legally competent evidence therein to support the agency's decision." JohnstonAmbulatory Surgical Assocs., Ltd. V. Nolan,755 A.2d 799, 805 (R.I. 2000) (quoting Barrington Sch. Comm. v.R.I. State Labor Relations Bd., 608 A.2d 1126, 1138 (R.I. 1992)). Competent or substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance."Newport Shipyard v. R.I. Comm'n for Human Rights,484 A.2d 893, 897 (R.I. 1984) (quoting Caswell v. George ShermanSand Gravel Co., 424 A.2d 646, 647 (R.I. 1981)).
The Court "may reverse [the] findings of the administrative agency only in instances where the conclusions and the findings of fact are totally devoid of competent evidentiary support in the record, or from the reasonable inferences that might be drawn from such evidence." Bunch v. Bd. Of Review,690 A.2d 335, 337 (R.I. 1997) (citations omitted). "Questions of law, however, are not binding on the court and may be reviewed to determine what the law is and its applicability to the facts."Narragansett Wire Co. v. Norberg,118 R.I. 596, 607, 376 A.2d 1, 6 (1977).
 III ANALYSIS Investigating Committee
The appellant raises a number of arguments on appeal. The first alleges that the Board failed to follow proper procedures in investigating the complaint brought by Delta Dental. Specifically, appellant contends that the Board did not appoint a two member investigating committee as required by § 5-31.1-11, which provides as follows: *Page 23 
 Any person, firm, corporation, or public officer may submit a written complaint to the board charging the holder of a license to practice dentistry or dental hygiene or a limited registrant with unprofessional conduct, specifying the grounds for the charge. . . . If the board determines that the complaint merits consideration, or if the board, on its own initiative without a formal complaint, has reason to believe that any holder of a license or limited registration to practice dentistry or of a license to practice dental hygiene may be guilty of unprofessional conduct, the chairperson shall designate two (2) members of the board, at least one of whom is a public member, to serve as a committee to investigate, and report upon the charges to the board. If the complaint relates to a dentist one member of the committee shall be licensed as a dentist.
The appellant argues for the first time on appeal that "there is no evidence that this procedure was followed" and claims that the only party who investigated this matter was Chairman of the Board, Henry Levin.
Under the "raise-or-waive" rule, the Supreme Court "will not consider appeals of issues that were not properly preserved in the lower court." State v. Nelson, 982 A.2d 602, 616 (R.I. 2009) (citing State v. Bido, 941 A.2d 822, 828 (R.I. 2008)). To satisfy this rule, "evidentiary objections (1) must be raised before the trial court and (2) be `sufficiently focused so as to call the trial justice's attention to the basis for said objection.'"Nelson, 982 A.2d at 616 (quoting State v. Gautier,950 A.2d 400, 407 (R.I. 2008)). There exists a very narrow exception to the raise-or-waive rule. See Shoucair v. BrownUniversity, 917 A.2d 418, 428 (R.I. 2007). Such exception exists "only when `basic constitutional rights' are concerned, and `even then only in very narrow circumstances.'" Id. (quotingHarvey Realty v. Killingly Manor CondominiumAssociation, 787 A.2d 465, 467 (R.I. 2001)) Accordingly,
 For the exception to apply, the party seeking it must demonstrate the existence of three factors: First, the error complained of must consist of more than harmless error. Second, the record must be sufficient to permit a determination of the issue. . . . Third, counsel's failure to raise the issue at trial must be due to the fact that the issue is based upon a novel rule of law which counsel could not reasonably have known at the time of trial. Id. *Page 24 
The Rhode Island Supreme Court "has not explicitly held that the raise-or-waive doctrine applies to administrative proceedings. . . ." East Bay Cmty Dev. Corp. v. Zoning Board of Review of the Townof Barrington, 901 A.2d 1136, 1153 (R.I. 2006). However, it is axiomatic that in order to properly review an alleged error made at the administrative level, the record must be sufficient to permit a determination of the issue. See Charles H. Koch, Jr.Administrative Law and Practice § 8.27 (stating that "the administrative record must generally be sufficient in itself to permit review"); Johnston Ambulatory SurgicalAssociates, Ltd. v. Nolan, 755 A.2d 799, 812 (R.I. 2000) (judicial review is limited to determining whether there is "sufficient competent evidence" to support findings made by administrative agency).
The appellant never raised this issue during the six days of testimony before the Board. While this does not necessarily constitute a waiver of the objection under current law, it nonetheless deprived the Board of the opportunity to respond to the claim and develop a record bearing on the issue of whether it had, or had not, followed the proper procedures in investigating the complaint made by Delta Dental. See East Bay Cmty Dev.Corp., 901 A.2d at 1153 (R.I. 2006). The record contains little evidence either way on this issue. Aside from claiming in his brief that "it was suggested by the DOH that Levin met privately with Balukjian and the Director of the DOH in order to discuss the allegations made by Delta," appellant points to nothing in the record to support his assertion, making review of this issue not possible. Accordingly, the Court finds that appellant has failed to present sufficient evidence to support his assertion that the Board did not conform to § 5-31.1-11.[3] *Page 25 
 Confidentiality and Sequestration Order
The appellant's second argument alleges that Dr. Balukjian and/or Delta Dental violated the confidentiality provision of § 5-31.1-11 and a sequestration order when a letter originating from Delta Dental was sent to an unknown number of appellant's patients on April 11, 2008, approximately one week after the initial day of hearings. The letter, entitled "Update for Patients of Dr. David Marcantonio," follows a previous notice sent on March 20, 2008 informing patients that appellant had been terminated from Delta Dental's provider network. (Appellant's Ex. H.) The letter states "[s]ince we mailed that notice, we have received numerous phone calls alerting us to additional quality of care issues." Id. The letter proceeds to list some of the "quality of care issues that have been identified," including untreated decay under restorations, "untreated infections that have the potential to lead to serious health issues," as well as "examples of fraud." Id.
The letter also informs patients, inaccurately, that "[a]fter a review of Dr. Marcantonio's patient and billing records, the Rhode Island Department of Health terminated his license." (emphasis added.) In fact, the appellant's license had been suspended pursuant to § 5-31.1-19 pending outcome of the hearing. The letter also advises patients that while appellant may still practice "with significant restrictions" pursuant to court order, patients will be responsible for paying appellant directly. Finally, the letter provides a list of options for patients who wish to lodge a complaint against appellant, including contacting the Board of Dental Examiners, consulting with an attorney, or informing the Consumer Protection Unit of the Office of the Attorney General.
The appellant objected vigorously to the letter at the subsequent hearing arguing that it was defamatory and contained "indirect, if not direct, references to the testimony of Dr. *Page 26 
Balukjian," thereby violating the confidentiality of the proceedings. (4/23/08 Tr. 4-5.) The appellant requested an evidentiary hearing to determine if Dr. Balukjian was involved in the publication of the letter, and if so, demanded that he be disqualified as an expert witness and sanctioned. The hearing officer, while conceding that the letter "was inarticulately drafted, [and] probably made conclusions which shouldn't have been made" denied appellant's motion. Id. at 25.
Regarding appellant's claim that the letter breached the confidentiality of the proceedings, the hearing officer disagreed, reasoning that Delta Dental "has an obligation to communicate with its insured to let them know that services performed by [appellant] may not be covered." Id. at 24. The hearing officer added that the matter is between appellant and Delta Dental and does not in any way prejudice the hearing, which has been "largely based on . . . medical records and bills." Id.
Questions of law are not binding on the court and are reviewedde novo. Narragansett Wire Co. v. Norberg,118 R.I. 596, 607, 376 A.2d 1, 6 (R.I. 1977). Section 5-31.1-11, entitled "[c]omplaints," outlines the process the Board must adhere to after receiving a complaint against a dentist or dental hygienist. The section includes the Board's responsibilities when reviewing and investigating complaints, when holding hearings, and issuing decisions. The confidentiality provision embedded therein provides, simply, that "[i]nvestigations . . . and full hearings before the board shall remain confidential." While it is clear from a reading of the section that Board members are bound by confidentiality, it is not apparent whether the provision would also prevent a witness from discussing the proceedings with a member of the public.
Our Supreme Court has recognized the "fundamental maxim of statutory construction that statutory language should not be viewed in isolation." In re Brown, 903 A.2d 147, 149 (R.I. 2006). *Page 27 
Accordingly, the confidentiality provision must be viewed in the context of the entire section, which is largely directed at outlining the Board's responsibilities. It cannot be assumed, as appellant has, that the legislature intended witnesses to be bound by the confidentiality provision contained in § 5-31.1-11.
By analogy, Rhode Island does not impose any such prohibition on witnesses who appear before a grand jury. Witnesses are permitted to disclose their own testimony even though secrecy applies to other participants in the process. Super. R. Crim. P. 6(e)(2); G.L. 1956, § 12-11.1-5.1 (stating that witnesses in grand jury proceedings may not be prohibited from disclosing their own testimony). This procedure is consistent with federal practice.See Fed.R.Crim.P. 6(e)(2).
The Rules for Practice and Procedures before the Department of Health, unfortunately, provide little specific guidance on the issue. See R.I. Code R. 14 000 001. While acknowledging that certain proceedings before it are non-public, and providing that the records of such hearings may "not be released for public scrutiny," the Rules appear to envision only a scenario where a member of the public, or the press, seeks access to confidential proceedings. It does not address the situation when a witness voluntarily comments on matters that are the subject of a pending disciplinary proceeding.
While not addressed by the parties in their memoranda, appellant's interpretation of the statute raises possibleFirst Amendment concerns. In Providence Journal Company v.Newton, 723 F. Supp. 846 (D.R.I. 1989), the United States District Court for the District of Rhode Island addressed the issue of whether a complainant in a proceeding before the Rhode Island Ethics Commission may be subject to sanctions for publicly disclosing information regarding his complaint when such disclosure had been declared confidential by state statute. The statute in *Page 28 
question provided that "[n]o person shall knowingly and willfully make public any complaint or the content of any complaint . . . without the consent of the person against whom the complaint has been filed." Id. at 849. Looking to the United States Supreme Court case Landmark Communications, Inc. v. Virginia,435 U.S. 829 (1978), the Newton Court held that the statute and its implementing regulations, which prohibited all public discussion of the existence or contents of a complaint prior to final adjudication, violated the free speech rights of the citizen who had filed the complaint.
The Newton Court cited other courts that similarly protected the free speech rights of individuals to comment publicly on pending investigatory proceedings, even when some of the comments made, as here, were inaccurate.Id. at 856 (citing Wood v. Georgia, 370 U.S. 375 (1962) as standing for the principle that "in the absence of a showing of `actual interference' with the fair administration of justice, an individual is empowered by the First Amendment to comment publicly on the precise matter that is the subject of a pending investigatory proceeding, and further that that right is in no way diminished by the fact that the speaker possesses a personal stake in the outcome of the proceeding or that his pronouncements are later found to be in error"); In re Perry, 859 F.2d 1043 (1st Cir. 1988) (holding that protective order prohibiting speech about pending administrative law proceedings violatedFirst Amendment, even though leaflets published by union "misrepresented what was taking place in the hearings"); see alsoFirst Amendment Coalition v. Judicial Inquiry and Review Bd.,784 F.2d 467 (3rd Cir. 1986) (holding that Pennsylvania's confidentiality laws for judicial ethics proceedings may not constitutionally prevent witnesses from disclosing their own testimony).
While mindful of these First Amendment concerns, the Court need not reach the constitutional issue because it is clear to the Court that the April 11, 2008 letter did not breach *Page 29 
the confidentiality of the proceedings. See In re Brown,903 A.2d 147, 151 (R.I. 2006) (stating that "[n]either [the Supreme] Court nor the Superior Court should decide constitutional issues unless it is absolutely necessary to do so); see also State ofRhode Island v. Lead Industries Association, Inc.,898 A.2d 1234, 1238 (R.I. 2006) (acknowledging the "deeply rooted commitment not to pass on questions of constitutionality unless adjudication of the constitutional issue is necessary") (internal quotations omitted).
The letter makes no reference whatsoever to the hearings that were taking place before the Board. While the letter references, albeit inaccurately, the DOH's Summary Suspension Order and the fact that appellant received a temporary restraining order to continue a limited practice, both of these items are public information.See G.L. 1956, § 38-2-1 et seq. (records held by a public body are subject to public disclosure unless they fall within one of the enumerated exceptions contained in the Access to Public Records Act (APRA); Providence Journal Co. v. ConventionCenter Authority, 774 A.2d 40 (2001). The hearing officer explained that summary suspension orders are typically released to the media because of the public health concerns involved. (4/23/08 Tr. 20.)
Nor does the letter reference any testimony heard by the Board during the April 2, 2008 hearing. Rather, the letter suggests that the "quality of care" issues identified were raised by patients calling Delta Dental to complain after receiving a notice that appellant had been terminated from its provider network. The State's case rested entirely upon the records of ten patients obtained through an audit of appellant's files, and no patients were called to testify. While the Court is mindful that the August 11, 2008 letter was likely personally hurtful and damaging to appellant's professional reputation, and may constitute a separate cause of action, it did not prejudice appellant's rights to a fair hearing before the Board.See section 42-35-15(g) *Page 30 
(noting that an administrative determination may only be reversed or modified "if substantial rights of the appellant have been prejudiced"). Section 5-31.1-11 does not require confidentiality about anything other than the administrative proceeding undertaken with the complaint.
The appellant also argues that the letter violated a sequestration order entered by the hearing officer at the commencement of the proceedings. Citing to United States v. Magana,127 F.3d 1 (1st Cir. 1997), among other cases, appellant argues that sequestration orders, aside from requiring the exclusion of witnesses from the courtroom, also forbid witnesses from discussing their testimony outside the courtroom. The Court disagrees with appellant's reading of these cases. TheMagana Court specifically stated that while Fed.R.Evid. 615 requires the court in criminal cases, upon a party's request, to "order witnesses excluded so that they cannot hear the testimony of other witnesses," beyond this basic mandate, "the court retains discretion to add other restrictions or not, as it judges appropriate." Id. at 5. The Court concluded that "[t]he regulation of witness conduct outside the courtroom is thus left to the district judge's discretion." Id. If a judge must act affirmatively to regulate witness conduct outside the courtroom in a criminal trial, there is no reason why a sequestration order entered in an administrative proceeding should be construed to automatically forbid witnesses from discussing their testimony outside the proceeding. See DOH Rule 12.11 (providing that the Rhode Island rules of evidence apply in contested cases and "shall be followed to the extent practicable"). In this situation, the hearing officer merely ordered certain witnesses to be excluded from the room. There is no evidence that he added other restrictions or intended to forbid witnesses from discussing their testimony outside the courtroom.Magana, 127 F.3d at 5. Accordingly, appellant's argument that the April 11, 2008 letter violated the hearing officer's sequestration order fails. *Page 31 
 Bias
The appellant next contends that Dr. Balukjian "was as biased and unobjective as a witness can be," and therefore, "he should have been disqualified and his testimony stricken from the record." The appellant essentially argues that Dr. Balukjian had "an axe to grind" with appellant and was acting out of a personal dislike of him. (6/18/08 Tr. 96.)
Like other witnesses, expert witnesses may be questioned "for the purpose of showing their feelings, bias, or prejudice where these factors may affect the value of their testimony." Am. Jur. 2d.Expert and Opinion Evidence § 74 (2009). "Cross-examination may be used to bring out the fact that a witness is regularly or frequently employed as an expert witness by one of the litigants, or to prove facts and circumstances which would naturally create a bias in the mind of the witness for or against the cause of either of the litigants." Id. However, generally, an expert's bias or credibility is an issue for the jury and not an appropriate factor on which the court may decide whether to admit an expert's testimony. See Slaughter v. Southern Talc Co.,919 F.2d 304, 306 n. 2 (5th Cir. 1990); seealso 4 Jacob A. Stein et al., AdministrativeLaw § 28.03 (2007) ("The fact that the testifying expert has an interest in the outcome of the proceeding does not affect the admissibility of his testimony.").
Moreover, courts are generally reluctant to disqualify an expert witness. See Lacroix v. BIC Corp.,339 F.Supp.2d 196, 199 (D. Mass. 2004). Disqualification of an expert is appropriate in conflict of interest situations "when a party retains an expert who previously worked for an adversary and received confidential information from the first client."Id. There is no evidence that Dr. Balukjian previously had a confidential relationship with appellant. See id.
As to the allegations of bias, appellant's counsel was given ample opportunity to cross-examine Dr. Balukjian concerning his feelings towards the appellant. Dr. Balukjian was *Page 32 
specifically questioned as to whether he had pre-formed opinions regarding appellant's ability to practice dentistry. (4/23/08 Tr. 37.) Dr. Balukjian responded that he "formed his opinions following an analysis of the audit that Delta Dental conducted and [had] no previous reasons to question Dr. Marcantonio's ability to treat patients. . . ."Id. at 39. The Board was certainly free to consider Dr. Balukjian's testimony and accord it less weight if they believed it was tainted by bias. See State v. Tiernan,941 A.2d 129, 134 (R.I. 2008) (stating that "the potential bias of a witness is always subject to exploration by cross-examination, and it is `always relevant as discrediting the witness and affecting the weight of his testimony'") (quoting 3A John H. Wigmore,Evidence in Trials at Common Law § 940 at 775). Accordingly, the Court finds no merit to appellant's argument that Dr. Balukjian should have been disqualified as an expert witness based upon his alleged bias toward appellant.
 Standard of Proof
The appellant next argues that § 5-31.1-16 violates the Due Process Clause of the Rhode Island and United States Constitution because it fails to state the standard of proof required to find the plaintiff guilty of unprofessional conduct. Section 5-31.1-16 provides that "[i]f a majority of the members of the board, sitting as the hearing committee, vote in favor of finding the accused guilty of unprofessional conduct as specified in the charges, the board shall prepare written findings of fact and law in support of its conclusion" In its decision, the Board makes clear that it employed a preponderance of the evidence standard.
To support his position, appellant cites an Oklahoma Supreme Court case Johnson v. Board of Governors of the State of Oklahoma,913 P.2d 1339, 1345 (1996), which determined that the proper standard of proof in a dental license revocation proceeding is the clear and convincing evidence standard. The appellant notes that several other jurisdictions have found *Page 33 
that the clear and convincing standard should apply to professional license revocation hearings. See Mississippi State Bd. ofNursing v. Wilson, 624 So.2d 485 (Miss. 1993); Davis v.Wright, 503 N.W.2d 814, 816 (Neb. 1993); Devous v. WyomingState Bd. of Medical Examiners, 845 P.2d 408, 410 (Wyo. 1993);Ettinger v. Board of Medical Quality Assurance,135 Cal.App.3d 853, 857 (Cal.App.2.Dist. 1982).
In Steadman v. Securities Exch. Comm'n,450 U.S. 91 (1981), the United States Supreme Court upheld the preponderance of the evidence standard in disciplinary proceedings before the Securities and Exchange Commission. Similarly, the petitioner in that case contended that because of the potentially severe sanctions the Commission was empowered to impose, it was required to employ a clear-and-convincing standard of proof.Id. at 95. The Supreme Court, however, held that the Administrative Procedure Act requires only the traditional preponderance of the evidence standard. Id. at 102. Indeed, "the preponderance of evidence standard of proof applies to the vast majority of agency actions." Pierce,Administrative Law Treatise § 10.7, at 766.
Although neither the United States Supreme Court nor our Supreme Court has specifically addressed that standard applicable to professional license revocation hearings, the majority of states have upheld the constitutionality of the preponderance of the evidence standard. See Johnson,913 P.2d at 1353 (Summers, J., dissenting) (citing, among other cases, Gandhi v. State Medical Examining Board,483 N.W. 2d 295 (Wis. 1992)). The Court finds the reasoning of these cases to be persuasive.
There is no question that appellant's right to practice dentistry in Rhode Island is a substantial interest and the potential deprivation caused by having that license suspended or revoked is great. See Gandhi, 483 N.W. 2d at 304-5 (employing three-part test enunciated by *Page 34 
United States Supreme Court in Mathews v. Eldridge,424 U.S. 319, 335 (1976)). However, the State has an equal, if not superior, interest in safeguarding the health of its citizens.Id. at 305. The State has an obligation to protect the public health and safety against incompetence and wrongdoing in the dental profession and has enacted specific regulations for this purpose. See section 5-31.1-1, et seq. Further, the risk of error in these proceedings is minimized due to the fact that the Board is composed of professionals in the field of dentistry, who are specifically qualified to weigh the facts and render a decision in this particular field. Gandhi,483 N.W. 2d at 307; see DePasquale v. Harrington,599 A.2d 314, 316 (R.I. 1991) (recognizing special competency of expert administrative tribunal to consider evidence that might be excluded from consideration by a jury under the rules of evidence). Thus, the Court agrees with the majority view that the preponderance of evidence standard, which allocates the risks equally between appellant and the State, is the appropriate standard to be applied here. As such, the Board did not err in applying the traditional preponderance of the evidence standard in this situation.
 Substantial Evidence
The appellant next argues that the Board's findings were clearly erroneous in view of the reliable, probative, and substantial evidence in the record. The appellant specifically takes issue with the methodology Dr. Balukjian employed for evaluating appellant's treatment, which involved reviewing appellant's patient records and X-rays without directly examining the patients themselves. The appellant cites Millerick v. Fascio,120 R.I. 9, 384 A.2d 601 (R.I. 1978) for the principle that an administrative agency may not adopt the conclusions of a non-examining doctor over the conclusions of a treating doctor.
The appellant's reliance on Millerick, however, is misplaced. Millerick involved a difference of opinion between a treating physician and a non-treating physician over whether a *Page 35 
claimant seeking Temporary Disability Insurance could have resumed work due to her physical condition. See id. at 12;see also 2 Richard J. Pierce, Jr.,Administrative Law Treatise § 11.3, at 804 (4th Ed. 2002) (discussing "treating physician rule" in typical context of Social Security disability cases).
Here, the issue before the Board was whether appellant, a licensed dentist, was guilty of unprofessional conduct as defined by § 5-31.1-10. The allegations against appellant include fraudulent billing and inadequate record keeping, both of which generally do not involve a dispute over any particular patient's physical condition. Therefore, the issue of whether or not Dr. Balukjian directly examined appellant's patients is largely irrelevant to these allegations. Moreover, these allegations are supported by substantial evidence in the record. As to the billing issue, appellant admitted that he had overcharged Delta Dental on a number of occasions, but insisted that his billing errors were innocent. (6/5/08 Tr. 22.) The Board declined to accept appellant's explanation. The law is clear that the Court may not substitute its judgment for that of the agency on issues involving the credibility of witnesses. See Barros, 710 A.2d at 684; Mine SafetyAppliances Co., 620 A.2d at 1259. This principle is true even where the Court, after reviewing the entire record and evidence, might be inclined to arrive at a different conclusion. SeeJohnston Ambulatory Surgical Assocs. v. Nolan,755 A.2d 799, 805 (R.I. 2000) (quoting Rhode IslandPub. Telecomm. Auth. v. Rhode Island State Labor Relations Bd.,650 A.2d 479, 485 (R.I. 1994)).
As to the issue of record keeping, the evidence is overwhelming that appellant's poor record keeping practices was a consistent source of problems. The appellant himself admitted that his record keeping is "awful." (6/5/08 Tr. 47.) The appellant's own expert observed that appellant's record keeping needed improvement. (6/18/08 Tr. 60.) Also, during final argument, *Page 36 
appellant's counsel observed that appellant's record keeping "leaves much to be desired." (6/18/08 Tr. 117.) There is no question that there is substantial evidence in the record to support the allegations that appellant's record keeping practices fell well below the standard of care in the field.
The other allegations made against appellant involve various examples of negligent treatment, including "[u]ntreated decay, undiagnosed pathology, inadequate root canals, and insufficient removal of decay under restorations." As stated previously, appellant principally takes issue with the fact that Dr. Balukjian did not directly examine any of the ten patients, but rather based his review of appellant's treatment upon charts and X-rays.
Rule 703 of the Rhode Island Rules of Evidence provides that
 an expert's opinion may be based on a hypothetical question, facts or data perceived by the expert at or before the hearing, or facts or data in evidence. If of a type reasonably and customarily relied upon by experts in the particular field in forming opinions upon the subject, the underlying facts or data shall be admissible without testimony from the primary source.
The Rule specifically authorizes experts to rely on materials compiled by others so long as they are "of a type reasonably and customarily relied upon by experts in the particular field."Crowe v. Marchand,506 F.3d 13, 17-18 (1st Cir. 2007). It is well established that medical professionals reasonably and customarily rely upon reports from other professionals in their field.Id. (reliance on medical reports "plainly justified in light of the custom and practice of the medical profession");Manocchio v. Moran, 919 F.2d 770, 780 (1st Cir. 1990) (stating that "physicians commonly base their opinions on tests and examinations performed by other physicians"). Indeed, the advisory committee's note to R.I. R. Evid 703 clearly recognizes that experts in the medical field routinely rely on reports from other medical professionals. See R.I. R. Evid. 703, advisory committee's note (providing that "a physician . . . bases his diagnosis on information *Page 37 
from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinion from nurses, technicians and other doctors, hospital records and X-rays . . .").
The Court is unaware of any requirement that an expert witness in the medical field examine a treating physician's or dentist's patients in order to form an opinion that that physician or dentist acted negligently or otherwise unprofessionally. See
6 Am. Jur. Trials 109, § 9 (stating that while it may be desirable for a witness to examine a patient prior to testimony, even if he has not actually treated the patient, "it is not a requirement"); see also State v. Correra,430 A.2d 1251, 1254 (R.I. 1981) (observing that "[w]hatever judicial skepticism may exist regarding psychiatric science is best resolved through the factfinder's determining the credibility and weight to be given the expert's testimony instead of resolving the uncertainty by a total exclusion"); State v. Vargus,118 R.I. 113, 127, 373 A.2d 150, 157 (1977) ("The degree of conclusiveness which characterizes the testimony of a witness, properly qualified to give his opinion as an expert, goes only to the weight and not the admissibility of evidence.")
Even if the examination of patients were a required basis for forming such an opinion under Rule 703, expert administrative tribunals are not rigidly bound by the rules of evidence designed for juries. DePasquale v.Harrington, 599 A.2d 314, 316-17 (R.I. 1991) ("An expert administrative tribunal concerned with advancing the public welfare should not be rigidly governed by rules of evidence designed for juries. . . . [A] hearing officer may take into account evidence that would be excluded from a trial by jury if it would be prudent to do so."). As such, expert opinion evidence must only meet the standards of the Administrative Procedure Act, i.e., "relevancy, materiality and noncumulativeness."See section 42-35-10(a); 4 Stein, AdministrativeLaw, § 28.03. *Page 38 
In this case, there is little question that Dr. Balukjian was qualified to act as an expert in this matter. In addition to being a director at Delta Dental, he is a practicing dentist with over thirty years of experience. Dr. Balukjian's specialized knowledge also assisted the triers of fact in that his accumulated experience in the dental profession helped the Board to assess the factual issue of whether appellant's treatment of the ten subject patients violated § 5-31.1-10.[4] Lastly, the Court finds that Dr. Balukjian's testimony is based upon sufficient facts and data. His opinions are based upon a careful review of the treatment charts and X-rays of ten patients. Such reliance does not render his opinion inadmissible. Rather, objections challenging the factual bases of an expert's opinion, "often go to the weight of the proffered testimony, not to its admissibility." Crowe,506 F.3d at 18.
Having found that the hearing officer did not err in admitting Dr. Balukjian's testimony, the Court also concludes that the Board's findings concerning appellant's alleged negligent treatment are supported by substantial evidence in the record. In its written decision, the Board made specific findings of fact as to each of the ten patients involved, making clear that it had closely reviewed the record and evidence before it. For instance, the Board's findings regarding appellant's treatment of the first patient "JC" are as follows:
 The [appellant's] treatment plan for Patient JC was flawed from the start. The [appellant] made a decision to extract the roots on teeth #'s 8 and 9 at the time of the insertion of the 4-unit bridge. This fails to meet the minimum standard of acceptable care due to the fact that roots need to be extracted before the insertion of the bridge because gums change shape after root extraction. The [appellant] then re-wrote the record, failed to note in the original chart that the record was re-written from memory. The [appellant] testified that the patient assisted him in re-writing the record. The *Page 39 
Hearing Panel finds that the Respondent re-wrote the record in order to deceive Delta Dental. His testimony regarding this issue was bereft of candor.
 Additionally, the Hearing Panel finds that this patient should have been referred to an oral surgeon. The Panel finds that the billing for treatment to JC to Delta Dental was fraudulent because he billed for a procedure that was incomplete. The Hearing Panel finds that the [appellant] failed to meet the minimum standards of acceptable care in violation of RIGL § 5-31.1-10(19).
The record contains substantial evidence, meaning such relevant evidence that a reasonable mind might accept as adequate, to support these findings. Both Dr. Balukjian and the appellant addressed these issues at length in their testimony through a detailed review of appellant's treatment charts and X-rays. While there may be some evidence in the record to support contrary findings, this Court may "reverse factual conclusions of administrative agencies only when they are totally devoid of competent and substantial evidence in the agency record." Milardo v. Coastal Resources ManagementCouncil, 434 A.2d 266, 272 (R.I. 1981). As these findings suggest, this case largely turns upon a credibility determination between Dr. Balukjian and the appellant. The Board found Dr. Balukjian's opinions to be more credible than the appellant's on most issues. This Court is "not privileged to assess the credibility of witnesses and may not substitute our judgment for that of the trial examiner concerning the weight of the evidence on questions of fact." Environmental Scientific Corp., 621 A.2d at 208. Accordingly, the Court concludes that the Board's findings that appellant engaged in unprofessional conduct as defined by § 5-31.1-10 is supported by credible and substantial evidence in the record.
 Board Reliance on its Expertise
Next, the appellant argues that the Board impermissibly relied upon the expert knowledge of its members in reaching factual conclusions. Specifically, the appellant contends that, in *Page 40 
several instances, the Board independently reviewed X-rays and rendered its own interpretation of those X-rays. As support for his argument, appellant cites Gilbert v. State Medical ExaminingBd., 349 N.W.2d 68, 84 (Wis. 1984), among other cases.
In Gilbert, the Wisconsin Supreme Court held that a board "cannot rely on the expert knowledge of its members to make such inferences from inconclusive testimony. Its actions must be based only upon the record before it. The Board may not substitute its knowledge for evidence which is lacking." Gilbert,349 N.W.2d at 84. In essence, Gilbert stands for the principle that the Board cannot rely on the expert knowledge of its members to fill the gaps in inconclusive evidence.
Here, however, the Board may have relied upon its members to review patient X-rays in order to resolve conflicting evidence. For example, appellant contends that with respect to Patient MK, the Board independently reviewed X-rays and rendered its own interpretation of those X-rays. The Board's findings make clear that it was resolving conflicting testimony of Dr. Balukjian and appellant over whether appellant had placed a full crown on tooth number three. The Board resolved that particular conflict in the appellant's favor. However, looking at x-rays is a routine part of a general dental practice, and the Board members had a right to evaluate the evidence and accept or reject that evidence in whole or part. See Poisson v. Comtec Information Systems, Inc.,713 A.2d 230, 235 (R.I. 1998) (observing that "[a]s the factfinder it was within the purview of the director to evaluate the evidence before him and to accept or reject the testimony of the witnesses in whole or in part"). Accordingly, the Board considered all of the evidence before it as factfinders and professionals.
There is nothing impermissible about the Board's Hearing Committee, which is composed entirely of professionals in the dental field, using its expertise to resolve conflicting *Page 41 
expert testimony under the law of this jurisdiction. In fact, other jurisdictions support this. See Stein, AdministrativeLaw § 28.03 (stating that "[b]ecause most agencies are presumed to have knowledge and expertise in their respective fields, they have wide discretion in determining the weight or probative value to be given the testimony of the expert witness, and may substitute their own expert opinion"); see also Willamette Industries,Inc. v. Tennessee Assessment Appeals Com'n,11 S.W.3d 142, 149 (Tenn. Ct. App. 1999) (same). Indeed, "[r]esolving conflicting evidence is for the agency. Thus, when conflicts in expert testimony arise, it is the agency's prerogative to resolve them, not the court's." Willamette Industries,Inc., 11 S.W.3d at 149. In such situations "courts typically will defer to an agency decision where the agency is acting within its area of knowledge and expertise[.]" Id. However, "[t]his is not to say that an agency may arbitrarily dismiss the opinion of an expert and substitute its own unsubstantiated opinion . . . The duty of the agency with regard to crediting or discounting expert evidence is to actually consider the expert's opinion in reaching a final decision." Wayne County v. Tennessee Solid Waste DisposalControl Bd., 756 S.W.2d 274, 281 (Tenn. App. 1988).
In the instant matter, the Board did not arbitrarily substitute its own unsubstantiated opinion for that of Dr. Balukjian and appellant. Rather, as a fact finder it permissibly resolved conflicting expert testimony. Accordingly, this Court concludes that this argument is without merit.
 Financial Conflict of Interest
The appellant further argues that his due process rights were violated because Board members had "an impermissible financial conflict of interest" with Delta Dental, which they failed to disclose. Specifically, appellant alleges that several of the Board members, including Chairman Levin, are participating dentists with Delta Dental. Earlier in his memorandum, *Page 42 
appellant asserted that most practicing dentists in Rhode Island receive a portion of their income from Delta Dental. The appellant contends that a fair and impartial Board should have been made up of members with no financial relationship to Delta Dental and that the DOH "deliberately chose to appoint these members with direct financial ties to Delta."
It appears that a substantial number of dentists in Rhode Island are participating providers of Delta Dental, appellant probably should have inquired as to whether the Board contained any such providers, and questioned them concerning any potential financial conflict of interest. If any such conflict were revealed, appellant then could have objected. However, it appears that appellant made no inquiries on the matter, and did not object to the makeup of the Board at the hearing on grounds of financial conflict of interest.
Had such an objection been made, appellant then would have had an opportunity to explore at the hearing the extent, if any, of the alleged conflicts of interest that each Board member may have possessed. At such a hearing, appellant could have ascertained how many Board members receive a potion of their income from Delta Dental and in what amount; what percentage of their practices rely upon income from Delta Dental; and whether there existed sufficient non-participating providers of Delta Dental who would have been qualified to replace Board members who may have had a conflict. At the conclusion of such a hearing, the Board then would have been in a position to determine whether there existed material financial conflicts of interest and, if so, whether there existed sufficient qualified, non-participating providers such that the Board could not make a finding of necessity. However, no such record was developed for this Court to review. Consequently, it appears that this issue may have been waived under the raise-or-waive rule.See Shoucair, 917 A.2d at 428. Out of an abundance of caution, however, the Court will address the merits of this claim of error. *Page 43 
"Due process requires a neutral, or unbiased, adjudicatory decisionmaker." 2 Pierce,Administrative Law Treatise § 9.8; Marshall v. Jerrico,Inc., 446 U.S. 238, 242 (1980) ("the Due Process Clause entitles a person to an impartial and disinterested tribunal"). This requirement also applies to state administrative agencies that adjudicate as well as to courts. Withrow v. Larkin,421 U.S. 35, 46 (1975) (citing Gibson v. Berryhill,411 U.S. 564, 579 (1973)). However, in order to make out a claim of bias, one must "overcome a presumption of honesty and integrity" on the part of decision-makers. Withrow, 421 U.S. at 47.
There are two ways to establish denial of the constitutional right to a fair hearing before an impartial tribunal. The first way is by demonstrating actual bias of the adjudicator. See Stivers v.Pierce, 71 F.3d 732, 741 (9th Cir. 1995) (citingTaylor v. Hayes, 418 U.S. 488, 501-04 (1974); CinderellaCareer and Finishing Schools, Inc. v. Federal Trade Comm'n,425 F.2d 583, 591 (D.C. Cir. 1970)). The second way is by demonstrating that the adjudicator has a pecuniary or personal interest in the outcome of the proceedings. Id. (citingGibson v. Berryhill, 411 U.S. 564 (1973)). In order to find a violation of this second type, the administrative board members must possess a direct and substantial pecuniary interest in the outcome of proceedings. Gibson, 411 U.S. at 579; Aetna LifeInsurance Co. v. Lavoie, 475 U.S. 813, 824 (1986).
In this case, appellant has presented no evidence that the Board members harbored actual personal bias against him. The appellant's argument rests entirely upon the allegation that several members of the Board, as practicing dentists, are members of Delta Dental's provider network. The membership in an association initiating or prosecuting proceedings is not sufficient reason for disqualification, absent some other prejudice, bias, or interest.See 97 A.L.R. 2d 1210, Disqualification, for Bias orInterest, of Member of Occupation or Profession Sitting in LicenseRevocation Proceeding, § 3(a). The appellant offers no credible evidence of *Page 44 
other prejudice, bias, or interest. There is nothing in the record to suggest that members of the Board had a personal relationship with Dr. Balukjian, or made extra judicial comments that might call into question their objectivity. See Stivers, 71 F.3d at 744. There is also nothing in any of the testimony or questions asked by Board members during the proceedings to suggest that they had negative or hostile feelings toward appellant.
Nor do the Board members have the type of "direct, personal, substantial, pecuniary interest" in the outcome of the proceedings necessary to preclude a member from participating in a decision.Id. at 743 (quoting Aetna Life, 475 U.S. at 822). There is no evidence that individual members of the Board are close competitors of the appellant or that any member of the Board stands to gain financially from the suspension of appellant's dental license. Their interest, if any, is remote and attenuated.See 97 A.L.R. 2d 1210, at § 3(c) (citing Klein v.Sobol, 167 A.D.2d 625, 629 562 N.Y.S.2d 856 (3rd
Dep't.1990) (in license suspension proceeding before hearing panel of state board of podiatry, evidence that three of the practicing podiatrists on the panel were located within approximately fourteen blocks, four miles and ten miles from the petitioners' respective offices was insufficient to establish that panel members had a pecuniary interest in the outcome of the proceedings); see alsoStivers, 71 F.3d at 743 ("[i]f members of a licensing board were disqualified whenever they have `some' competitive interest in the outcome of proceedings before them, practitioners in the field would as a practical matter be excluded from becoming members of such boards.").
The allegation that Board members would abdicate responsibility to act as neutral and unbiased decision-makers because one of their insurance providers initiated a complaint and participated in proceedings charging a fellow dentist with unprofessional conduct is simply not enough, without more facts, to overcome the presumption of honesty and integrity necessary to *Page 45 
make out a case of unconstitutional bias. Withrow,421 U.S. at 47. While the Board members involved perhaps could have disclosed that they, like appellant, are participating providers of Delta Dental, their failure to do so did not substantially prejudice the rights of the appellant and is not cause for reversal.
 Sanctions
Finally, the appellant argues that the sanctions imposed by the Board are disproportionate and clearly in excess of its statutory authority. In its decision, the Board imposed the following sanctions:
 [Appellant] is hereby suspended from the practice of dentistry in Rhode Island for a minimum of Two (2) Years. [Appellant] may not be reinstated unless he enrolls in and completes an ADA approved "Advanced Standing Program" in a School of Dentistry such as those offered at Boston University School of Dentistry, Tufts University School of Dental Medicine or a similar program at an ADA approved school. Additionally, [Appellant] must complete a course in proper documentation of a clinical record. The Board must approve all remedial courses in advance and in writing before enrollment. Respondent is assessed a Ten Thousand ($10,000) Dollar Administrative Fee in accordance with RIGL § 5-31.1-17(8).
The appellant argues that a two-year suspension is "the functional equivalent of a license revocation" and points out that the $10,000 fine is the maximum allowable by law. The appellant particularly takes issue with the requirement that he enroll in an "Advanced Standing Program," which he contends essentially requires him to repeat the third and fourth years of dental school.
Under § 5-31.1-17, the director of the Department of Health, at the direction of the Board, may impose any number of sanctions upon a dentist who has been found guilty of unprofessional conduct. Among the nine enumerated sanctions, the director may "suspend, limit or restrict" a license to practice dentistry, require the dentist to participate in a program of *Page 46 
continuing education, and levy a maximum assessment of $10,000.See sections 5-31.1-17(2), 5-31.1-17(6), 5-31.1-17(8). In addition, the director is authorized to impose "[a]ny other condition, conditions or restrictions deemed appropriate under the circumstances." Section 5-31.1-17(9).
"Administrative agencies have considerable latitude to shape their penalties within the scope of their statutory authority." 2 Am. Jur. 2d Administrative Law § 453. Courts must defer to the agency's judgment "unless the penalty is so harsh and unconscionably disproportionate" as to amount to an abuse of discretion. Id. Thus, a sanction will not be set aside on appeal unless it is arbitrary, capricious, or a clear abuse of authority. Id. As stated by one court,
 it is well settled that in reviewing the penalty imposed by an administrative body which is duly constituted to announce and enforce such penalties, neither a trial court nor an appellate court is free to substitute its own discretion as to the matter; nor can the reviewing court interfere with the imposition of a penalty by an administrative tribunal because in the court's own evaluation of the circumstances the penalty appears to be too harsh. Such interference . . . will only be sanctioned when there is an arbitrary, capricious, or patently abusive exercise of discretion. Shakin v. Board of Medical Examiners, 254 Cal.App.2d 102, 112-13 (Cal. App. 2nd Dist. 1967).
This Court finds that the sanctions imposed by the Board are not arbitrary, capricious, or a patent abuse of discretion. The sanctions imposed are well within the Board's statutory authority. Section 5-31.1-17 specifically authorizes the Board to suspend, and even revoke, a license to practice dentistry. As to the duration of the suspension, the Board apparently felt that a two year suspension was the necessary length of time required for appellant to complete a continuing education program in the areas in which he had been judged deficient.See section 5-31.1-17(6). It is not appropriate, as a practical matter, for this Court to substitute its judgment for that of the agency charged with regulating dental licenses as to the length of suspension or the type of continuing education required.See Kulkin v. Bergland, 626 F.2d 181, 185 (C.A. Mass. 1980); *Page 47 see also Broad Street Food Market, Inc. v. U.S.,720 F.2d 217, 220 (1st Cir. 1983) (when Congress entrusts enforcement to administrative agency, choice of sanction is peculiarly a matter for administrative competence). This Court does not find the sanctions imposed in this case were in excess of the Board's statutory authority.
 Conclusion
After reviewing the record, this Court finds that the Board's decision to suspend appellant's license to practice dentistry was based on reliable, probative, and substantial evidence in the record, its actions were not arbitrary or capricious or characterized by an abuse of discretion, and was not in excess of its statutory authority. Thus, the appellant's substantial rights have not been prejudiced. Accordingly, the appellant's appeal is denied, and the decision of the Board is affirmed. Counsel shall prepare an appropriate judgment for entry.
[1] Section 5-31.1-19 provides that
 [t]he director may, temporarily, suspend the license of a dentist or dental hygienist or limited registrant without a hearing if the director finds that evidence in his or her possession indicates that a dentist or dental hygienist or limited registrant continuing in practice would constitute an immediate danger to the public. In the event that the director temporarily suspends the license of a dentist, dental hygienist or limited registrant without a hearing, a hearing by the board must be held within ten (10) days after the suspension has occurred.
[2] Fictitious names are being used to protect the confidentiality of patients.
[3] Assuming that the raise-or-waive rule is applicable in the first instance, the Court observes that the instant situation does not fall within the narrow exception to the raise-or-waive rule.
[4] The Court finds no merit to appellant's argument that Dr. Balukjian never established the standard of care in dentistry. Throughout his testimony, he articulated the standard applicable to the relevant areas of inquiry, such as root extractions in Patient JC, untreated decay and lack of documented treatment plan in Patient JG, and underfilled canals in Patients RT and SV. An expert is not required "to state his opinion . . . in any particular form or by use of any magic words." Lambley v.Kameny, 682 N.E.2d 907, 914 (Mass.App.Ct. 1997).